389 A.2d 545

COMMONWEALTH of Pennsylvania

v.

Hayford CHRISTIAN, Appellant (two cases).

Supreme Court of Pennsylvania.

Argued March 8, 1977.

Decided July 14, 1978.

Paul F. Laughlin, Thomas G. Michalek, Laughlin & Michalek, Pittsburgh, for appellant.

Robert E. Colville, Dist. Atty., Robert L. Eberhardt, Charles W. Johns, Asst. Dist. Attys., Pittsburgh, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

POMEROY, Justice.

On March 4, 1975, appellant, Hayford Christian, was convicted by a jury of murder of the second degree, burglary, rape and deviate sexual intercourse. After denial of post-trial motions, appellant was sentenced to imprisonment for life on the murder charge. Consecutive sentences of ten to twenty years imprisonment were imposed on each of the remaining charges. From these judgments Christian appeals.[1]

---

1. We hear this appeal pursuant to the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, 17 P.S. § 211.202(1) which places jurisdiction in this Court of the appeal from appellant's murder conviction. This Court has jurisdiction over the appeal from the

The record discloses that early on the morning of July 9, 1974, Agnes Mattes, a seventy-nine year old resident of Jefferson Borough, Allegheny County, was forcibly removed from her home and taken to a nearby isolated swamp where she was raped and sodomized. Her body was discovered later the same day, face down in the swampy area. The medical evidence established that the cause of death was drowning. Christian was arrested and charged with the murder and rape on September 27, 1974.

The evidence against appellant was largely circumstantial and consisted of the following: Testimony by a female neighbor of appellant that at approximately 2:00 A.M. on the morning of July 9, following a party in the housing complex where they resided, Christian had made sexual advances to her which she had refused; testimony that Christian had not returned to his residence during the early morning hours of July 9; witness reports that Christian had been seen on the morning of July 9 coming from the area in which the crime occurred; evidence that Christian's clothes were covered with a murky substance, possibly matching the mud from the swampy area in which the body was found, but that the articles of clothing had been immediately cleaned before the police investigators were able to examine them on the day of the crime; and testimony of a prisoner who overheard the appellant make an incriminating statement while incarcerated and awaiting trial.

Appellant raises a number of alleged trial errors as grounds for a new trial. One of these is that the trial court unduly restricted the voir dire examination, a contention that we find meritorious. We, accordingly, reverse the judgment of sentence and award a new trial.[2]

related convictions by virtue of their transfer from the Superior Court to this Court.

2. Additionally, appellant argues that the trial court erred both in refusing his demurrer following the close of the prosecution's case and in denying his motion for a directed verdict at the conclusion of the defense. Since Christian chose to put on a defense, the trial court's ruling on the demurrer may no longer be contested. See *Commonwealth v. Ilgenfritz*, 466 Pa. 345, 353 A.2d 387 (1976). As to

Prior to trial, counsel for each side submitted proposed voir dire questions to the trial court. Among appellant's requested inquiries were the following:

"(1) Have you had any dealings or experiences with Negro persons that might make it difficult for you to sit in impartial judgment on this case?

"(2) This case involves a rape-murder, the defendant in this case is black, do you feel that blacks have sexual drives that differ from whites?

"(3) There may be some evidence in this case that early on the night when this murder was committed the defendant, who is black, evidenced affection for a white girl. Do you believe that there is anything wrong with a black man showing affection to a white woman?

"(4) Do you feel that anyone so evidencing affection would be more likely to commit a crime than anyone else?"

Question (1) was allowed but the remaining three questions were refused. Appellant made prompt objection to this ruling and preserved the issue for appellate review. The issue now presented is whether this ruling denied Christian a fair trial.

■ There is no doubt that voir dire is a crucial stage in a criminal proceeding and one which affords counsel an opportunity to determine juror qualifications as well as establish a

the motion for a directed verdict, our review of the record satisfies us that it was properly denied; when viewed in a light most favorable to the Commonwealth, the evidence was sufficient to establish guilt beyond a reasonable doubt. See, e. g., *Commonwealth v. Hubbard,* 472 Pa. 259, 372 A.2d 687 (1977).

In light of our disposition of this appeal, we find it unnecessary to reach appellant's other contentions. They are: (1) the trial court erred in refusing to grant a new trial based upon the recantation of a Commonwealth witness; (2) the prosecution improperly suppressed exculpatory materials; (3) a prosecution witness should not have been permitted to testify; and (4) the trial court, in its charge to the jury, misstated the law concerning the Commonwealth's burden of proof.

basis for the effective exercise of peremptory challenges.[3] While the right of a litigant to inquire into juror qualifications has been generally recognized,[4] the scope of such inquiries is, nevertheless, a matter within the discretion of the trial court and that court's rulings will be reversed only upon a finding of an abuse of discretion. *Commonwealth v. Futch, supra; Commonwealth v. Brown,* 464 Pa. 625, 347 A.2d 716 (1975); *Commonwealth v. Segers,* 460 Pa. 149, 331 A.2d 462 (1975); *Commonwealth v. Dukes,* 460 Pa. 180, 331 A.2d 478 (1975); *Commonwealth v. Johnson,* 452 Pa. 130, 305 A.2d 5 (1973). A trial court's rulings concerning the scope of voir dire must, therefore, be considered in light of the factual circumstances of a particular criminal episode.[5]

**3.** See *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); *Commonwealth v. Futch,* 469 Pa. 422, 366 A.2d 246 (1976); *Commonwealth v. Corbin,* 426 Pa. 24, 231 A.2d 138 (1967). *See also* Brill, Examination of Jurors, 29 Mo.L.Rev. 259 (1964); Note, Criminal Procedure—The Right to Question Jurors on Racial Prejudice, 37 Ohio St.L.J. 412 (1976); Note, Exploring Racial Prejudice on Voir Dire, 54 B.U.L.Rev. 394 (1974); Note, Voir Dire, Prevention of Prejudicial Questioning, 50 Minn.L.Rev. 1088 (1966).

**4.** While most jurisdictions recognize the right to examine prospective jurors with respect to their qualifications, there remains considerable disagreement as to how the voir dire itself should be carried out. It has been argued that voir dire examination by counsel is a constitutional right. *See* Gutman, The Attorney-Conducted Voir Dire of Jurors: A Constitutional Right, 39 Brooklyn L.Rev. 290 (1972). On the other hand, studies have emphasized the benefits of a court conducted voir dire examination. *See* Rolewick, Voir Dire Examination of Jurors, 25 De Paul L.Rev. 50 (1975). For a general discussion of the divergent views on this subject, *see* ABA Project on Standards for Criminal Justice, Standards Relating to Trial by Jury, § 2.4 and Commentary (Approved Draft, 1968); Levit, Nelson, Ball & Chernick, Expediting Voir Dire: An Empirical Study, 44 S.Cal.L.Rev. 916 (1971); Broeder, Voir Dire Examinations: An Empirical Study, 38 S.Cal.L.Rev. 503 (1965); Carr, Voir Dire Examination of Jurors: An Appraisal by an Attorney, 1963 U.Ill.L.F. 653.

**5.** "The Constitution does not always entitle a defendant to have questions posed during voir dire specifically directed to matters that conceivably might prejudice veniremen against him. *Ham* [*v. South Carolina,* 409 U.S. 524] supra, at 527–528, 93 S.Ct. 848, 35 L.Ed.2d 46 [(1973)].

     \*     \*     \*     \*     \*     \*

"In *Ham,* however, we recognized that some cases may present circumstances in which an impermissible threat to the fair trial

In the present case, it is clear that circumstances were present which would make it necessary to inquire into racial sensitivity of potential jurors. The crime—the rape and other sexual molestation of an elderly woman—was itself shocking. The fact that the victim was white and the accused a black man cannot be ignored.[6] This racial difference was emphasized by the Commonwealth's trial strategy as it later developed; this was to attempt to establish the sexual proclivity of the appellant by evidence of advances made by him towards a white woman a short time before the occurrence of the instant crime.[7] The case was thus racially sensitive, and one in which there was need on voir dire for inquiry into the possible racial prejudices of potential jurors.

The Commonwealth argues that even if it be conceded that the case is racially sensitive, the question approved by the trial court ("Have you had any dealings or experiences with Negro persons that might make it difficult for you to sit in impartial judgment in this case?") was adequate to explore in sufficient depth the possible prejudices of venire-

guaranteed by due process is posed by a trial court's refusal to question prospective jurors specifically about racial prejudice during voir dire.

\* \* \* \* \* \*

"By its terms *Ham* did not announce a requirement of universal applicability. Rather, it reflected an assessment of whether under all of the circumstances presented there was a constitutionally significant likelihood that, absent questioning about racial prejudice, the jurors would not be as 'indifferent as [they stand] unsworne.' Coke on Littleton 155b (19th ed. 1832)." *Ristaino v. Ross,* 424 U.S. 589, 594–96, 96 S.Ct. 1017, 1020, 1021, 47 L.Ed.2d 258, 263–64 (1976) (footnote omitted).

Accord: *Commonwealth v. Futch,* 469 Pa. 422, 366 A.2d 246 (1976).

6. We do not wish to suggest that merely because a defendant and a victim are members of different social or racial groups there immediately arises a right to explore such relationships on voir dire. The potentially prejudicial impact of such affiliations does become meaningful, however, where membership in a certain group or minority is to be emphasized by the evidence presented at trial.

7. Assuming that a juror might possess racial bias, it is likely that evidence of this sort would inflame his prejudice and militate against a fair trial even prior to evidence linking the defendant to the crime in question.

138

men. We disagree.[8] First, that question was framed in terms of "dealings or experiences." Even assuming that the question was specific enough to discover prejudice, it would not be apt to reach persons who are perhaps most susceptible to stereotypic views, viz., persons who have had little or no dealing with black persons. Beyond that, we are unable to conclude with any degree of assurance that such a question was sufficiently probing or specific to reveal prejudices which might have immediate bearing on the present case.[9]

8. Compare *Commonwealth v. Futch, supra,* where we held that other voir dire questions ("Have you had any experience with black persons that might impair your ability to be fair and impartial?" and "Will the fact that the defendant is a black person affect in any way your judgment in this case?") were sufficient to probe racial bias and that accordingly, it was not error for the trial court to disallow the following question:

"Would you give more credence to the testimony of a white person over that of a black person simply because he is white?"

*Futch* is, however, distinguishable both because the present episode arguably contains more racial involvement and because it is clear that the permitted questions in the *Futch* case were more specific in testing racial orientation than was the single question allowed in appellant's examination.

9. We cannot assume that a general cursory treatment of racial attitudes is sufficient to establish juror qualification. *See* Van Dyke, Voir Dire: How Should It Be Conducted To Ensure That Our Juries Are Representative and Impartial, 3 Hastings Const.L.Q. 65 (1976). Indeed, specific questions may be necessary to probe prejudices which are often deep-rooted and unrecognized. *See* Note, Exploring Racial Prejudice on Voir Dire, 54 B.U.L.Rev. 394, 417–19 (1974). See also *United States v. Bear Runner,* 502 F.2d 908 (8th Cir. 1974). Unfortunately, prejudice is a fact of life which should never be treated lightly in the interests of assuring a fair trial. As Justice Marshall has well said:

"Finally, to say that petitioner is not a potential target of racial prejudice would be to ignore as judges what we must all know as men. That petitioner was tried in Boston, Massachusetts, while Gene Ham was tried in Florence, South Carolina, is of no consequence. Racial prejudice is a cultural malady that has shaped our history as a nation. It is a cancer of the mind and spirit which breeds as prolifically in the industrial cities of the North as in the rural towns of the South. And where, as here and in the strikingly similar circumstances of the *Aldridge* case [*Aldridge v. U. S.,* 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054], a Negro is being accused of an attack on a white policeman, it would be disingenuous at best to assert that he is not apt to be a particular target of racial prejudice." *Ross v. Massachusetts,* 414 U.S. 1080, 1085, 94 S.Ct. 599, 602, 38 L.Ed.2d 486, 488–89 (1973) (dissenting opinion of Marshall,

Rather, in view of the facts of the instant case, we think that questions (2) and (3) were better suited to elicit the prospective jurors' racial prejudices in a manner germane to issues which would crystalize at trial.

The Commonwealth next argues that even if the proposed voir dire questions were well designed to probe racial attitudes, they were properly rejected because the inquiries were designed to disclose a juror's present impressions regarding facts to be developed at trial. See *Commonwealth v. Johnson,* 452 Pa. 130, 305 A.2d 5 (1973); *Commonwealth v. Hoss,* 445 Pa. 98, 283 A.2d 58 (1971). To an extent we agree. Question (4) ("Do you feel that anyone so evidencing affection would be more likely to commit a crime than anyone else?") was too suggestive of the ultimate facts to be established at trial and accordingly was properly refused. Likewise, question (3) contained material irrelevant to the issue of possible juror prejudice. Thus we believe that the first sentence of that question ("There may be some evidence in this case that early on the night when this murder was committed the defendant, who is black, evidenced affection for a white girl") unnecessarily referred to specific facts and should have been stricken. Nevertheless, it does not follow that the legitimate need to explore specific and relevant prejudices, having been brought to the attention of the court, should have been stricken in toto simply because the question, as framed, contained superfluous matter. The purpose of voir dire is to secure a "competent, fair, impartial and unprejudicial jury." *Commonwealth v. Futch,* 469 Pa. at 426, 366 A.2d at 248. That responsibility must be shared by the trial court and respective counsel in the interests of vindicating the public interest in assuring a fair trial. The proper response to such a legitimate concern, even though the question itself might be

J., joined by Douglas & Brennan, JJ., to denial of petition for certiorari) (footnotes omitted).

improperly constructed, is to fashion a permissible inquiry so that the possible prejudice or bias may be exposed.[10]

Because we are unable to conclude that the scope of voir dire in the instant case assured to the defendant his right to trial by an impartial tribunal,[11] we are compelled to award a new trial.

10. Such a requirement is analogous to those situations where counsel requests specific points for charge at the conclusion of a trial but poses the charge in a manner which erroneously states the law. In such instances we have held that once being placed on notice of the substance of the charge, the trial court is under a duty to include in its charge an accurate statement of the law on the subject matter raised in the requested point. *Commonwealth v. Sisak,* 436 Pa. 262, 269–70, n.5, 259 A.2d 428, 432, n.5 (1969). See also *Commonwealth v. Motley,* 472 Pa. 421, 372 A.2d 764 (1977) (plurality opinion, ROBERTS, J.); *Commonwealth v. Hilliard,* 471 Pa. 318, 324, 370 A.2d 322, 325 (1977) (dissenting opinion of EAGEN, C. J.); *Commonwealth v. Coach,* 471 Pa. 389, 397, 370 A.2d 358, 362 (1977) (concurring opinion of POMEROY, J.); *Commonwealth v. Mitchell,* 460 Pa. 665, 334 A.2d 285 (1975) (plurality opinion, MANDERINO, J.). Both voir dire examination and the charge to the jury have identical purposes—to see that the guilt or innocence of a defendant is considered in a fair and objective manner and in accordance with applicable law.

11. In *Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973), the Supreme Court of the United States indicated such a right was of constitutional dimension:
   " . . . Since one of the purposes of the Due Process Clause of the Fourteenth Amendment is to insure these 'essential demands of fairness,' e. g., *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 289, 86 L.Ed. 166 (1941), and since a principal purpose of the adoption of the Fourteenth Amendment was to prohibit the States from invidiously discriminating on the basis of race, *Slaughter-House Cases* [83 U.S. 36], 16 Wall. 36, 81, 21 L.Ed. 394 (1873), we think that the Fourteenth Amendment required the judge in this case to interrogate the jurors upon the subject of racial prejudice. . . ." 409 U.S. at 526–27, 93 S.Ct. at 850, 35 L.Ed.2d at 50. Accord, *Commonwealth v. Brown,* 464 Pa. 625, 347 A.2d 716 (1975). The constitutional underpinnings of *Ham* were weakened, however, in *Ristaino v. Ross, supra,* where the Supreme Court indicated that the mere fact that a case involved a black defendant and a white victim did not give rise to a *constitutional* right to explore prejudice through voir dire examination. Our Court, however, has held that such a right is well-grounded in state law and that *Commonwealth v. Brown, supra,* is still good law. See *Commonwealth v. Futch, supra,* 469 Pa. at 428, n.4, 366 A.2d 246. We repeat, however, that the scope of voir dire examination rests within the discretion of the trial court and is governed by the need for such inquiry as is disclosed by a factual analysis of a particular case.

Judgments of sentence are reversed and appellant is granted a new trial.

MANDERINO, J., filed a concurring opinion in which NIX, J., joins.

ROBERTS, J., filed a dissenting opinion.

EAGEN, C. J., dissents and would affirm the judgment of the court below.

MANDERINO, Justice, concurring.

The evidence in this case, as later explained, does not establish the guilt of the appellant beyond a reasonable doubt. His judgment of sentence should be reversed and the appellant ordered discharged. Since, however, a majority of this Court does not agree, I join in that portion of Mr. Justice Pomeroy's opinion which reverses the judgment of sentence because the trial court unduly restricted the voir dire examination.

Instead of being awarded a new trial, however, the proper disposition of this case would be to discharge the appellant. We have often stated the test to be applied by the appellate courts when faced with a challenge to the sufficiency of the evidence:

"Where a claim of sufficiency of the evidence has been raised, it is our task on appellate review to determine whether accepting as true all of the evidence and all of the inferences therefrom upon which, if believed, the jury could properly have based its verdict, it is sufficient in law to prove beyond a reasonable doubt that a defendant is guilty of a crime or crimes of which he has been convicted. *Commonwealth v. Bayard*, 453 Pa. 506, 509, 309 A.2d 579, 581 (1973); *Commonwealth v. Paquette*, 451 Pa. 250, 301 A.2d 837 (1973); *Commonwealth v. Williams*, 450 Pa. 327, 329, 301 A.2d 867, 869 (1973); *Commonwealth v. Wright*, 449 Pa. 358, 360, 296 A.2d 746, 747 (1972); *Commonwealth v. Agie*, 449 Pa. 187, 296 A.2d 741 (1972). Further, there need not be direct evidence to establish the elements of

the crime. *Commonwealth v. Graham*, 467 Pa. 417, 358 A.2d 56 (1976); *Commonwealth v. Cox*, 466 Pa. 582, 353 A.2d 844 (1976). This burden may be sustained by means of wholly circumstantial evidence. *Commonwealth v. Stanley*, 453 Pa. 467, 469, 309 A.2d 408, 410 (1973); *Commonwealth v. Amato*, 449 Pa. 592, 594, 297 A.2d 462, 464 (1972); *Commonwealth v. McFadden*, 448 Pa. 146, 149, 292 A.2d 358, 360 (1972); *Commonwealth v. Chester*, 410 Pa. 45, 50, 188 A.2d 323, 327 (1963). As we noted in *Commonwealth v. Stanley, supra:*

'We also recognize that while the Commonwealth must establish every essential element of a crime beyond a reasonable doubt, this burden may be sustained by means of wholly circumstantial evidence.' *Id.* 453 Pa. at 469, 309 A.2d at 410."

*Commonwealth v. Courts*, 468 Pa. 613, 364 A.2d 684 (1976). Although each element of the crime charged may be established solely through circumstantial evidence, the proof must lead to more than mere suspicion and conjecture, *Commonwealth v. Fields*, 460 Pa. 316, 333 A.2d 745 (1975). Circumstantial evidence may be said to be sufficient to establish any of the crime's essential elements only if the inferences arising from it prove the fact in question beyond a reasonable doubt. *Commonwealth v. Amato*, 449 Pa. 592, 297 A.2d 462 (1972).

The prosecution's entire case against Hayford Christian was carefully constructed of circumstantial evidence. That construction, however, fails to establish beyond a reasonable doubt each of the elements of the crimes charged. Appellant should therefore be discharged.

The evidence produced by the prosecution at appellant's trial is summarized in the majority opinion as follows:

"The evidence against appellant was largely circumstantial and consisted of the following: Testimony by a female neighbor of appellant that at approximately 2:00 a. m. on the morning of July 9, following a party in the housing

complex where they resided, Christian had made sexual advances to her which she had refused; testimony that Christian had not returned to his residence during the early morning hours of July 9; witness reports that Christian had been seen on the morning of July 9 coming from the area in which the crime occurred; evidence that Christian's clothes were covered with a murky substance, possibly matching the mud from the swampy area in which the body was found, but that the articles of clothing had been immediately cleaned before the police investigators were able to examine them on the day of the crime; and testimony of a prisoner who overheard the appellant make an incriminating statement while incarcerated and awaiting trial." (at p. 134)

As can readily be seen from the above summary, there was no direct evidence placing appellant at the location where the victim's body was found or at the victim's house at any time on the night of the homicide. In fact, the prosecution's own expert witnesses gave evidence tending to establish that appellant was *not* at either location. For example, a police detective testified that the vegetation on the path leading from the victim's house to the location where the body was found was so thick that he had trouble going through it in daylight without tearing his uniform. Although the perpetrator of this crime had violently assaulted the decedent, and dragged her struggling body from her home over severe and dangerous terrain without the benefit of light, the prosecution's own witnesses testified that when appellant was examined by police on July 9, the day the murder had been committed, he was found to be completely free of any cuts, bruises, bites, scratches or any visible signs that he might have participated in this crime. Furthermore, the clothing that appellant wore at the party on the evening of July 8, and which was found by the police in appellant's bathroom, was thoroughly examined by the representatives of the crime lab and no damage to the garments was noted. In addition, trace evidence was found at the scene of the

crime which strongly indicated that someone else had perpe-
trated the crime. Prosecution witnesses testified that two
palm prints were found on the metal arms of a folding
summer chair placed near the window which had been
broken to permit the murderer to enter the Mattes' house.
These prints were not placed by an individual sitting in the
chair, but by someone facing the chair, as if the chair was
lifted and used to break the window. The prints were not
those of appellant or the victim. A red fiber was removed
from a figurine on the nightstand in Mrs. Mattes' room.
This fiber did not match any of the Mattes' clothing, nor did
it match the appellant's clothing. The police crime lab also
determined, after careful scientific analysis, that samples of
mud taken from appellant's shoes and boots did not match
samples of mud taken from the murder scene, and that the
material obtained from the drain of the tub where appel-
lant's clothes had been washed did not match any material
or dirt obtained by the crime lab from the murder scene.
Samples of mud taken from the steps and front porch of the
Mattes' home, however, were similar to that collected from
the murder scene.

The only other evidence presented at trial by the prosecu-
tion in its attempt to show that appellant committed the
crimes charged was the "incriminating statement" referred
to in the above quoted excerpt from the majority opinion.
Examination of the record, however, reveals that this al-
legedly incriminating statement, even if made, was not
incriminating at all. (The prisoner who testified that he
overheard the statement referred to above and in the major-
ity opinion has since recanted that testimony and said that
no such statement was ever made in his presence.) The
statement which the prosecution's witness testified to hear-
ing was allegedly made by appellant in response to a ques-
tion put to him by another inmate at Allegheny County Jail
where he was incarcerated following his arrest on the in-
stant charges. The fellow inmate, according to the prosecu-
tion's witness at trial, said,

"Why the hell did you kill her?"

appellant, according to this same witness, replied,

"Well, what the fuck. They can't prove it anyhow."

This statement is not an admission that appellant was involved in the perpetration of the crimes for which he was being tried. *See, Commonwealth v. Jefferson*, 430 Pa. 532, 243 A.2d 412 (1968) (dissenting opinion of Roberts, J.).

A criminal conviction may not be based upon mere surmise or conjecture. Although it may accurately be said that the prosecution's evidence in this case cast suspicion upon appellant, that evidence failed to establish beyond a reasonable doubt that appellant committed the acts for which he was tried.

NIX, J., joins in this concurring opinion.

ROBERTS, Justice, dissenting.

I dissent. The majority concludes that the trial court committed reversible error in refusing to allow appellant to ask prospective jurors the following questions:

"This case involves a rape-murder, the defendant in this case is black, do you feel that blacks have sexual drives that differ from whites?

Do you believe that there is anything wrong with a black man showing affection to a white woman?"

The trial court did allow appellant to ask:

"Have you had any dealings or experiences with Negro persons that might make it difficult to sit in impartial judgment on this case?"

I believe the trial court, in allowing appellant to ask this question, fulfilled its obligation to permit appellant to explore an area of potential juror prejudice relating to this trial. See *Commonwealth v. Futch*, 469 Pa. 422, 366 A.2d 246 (1976) (no reversible error where trial court refused to allow accused to ask potential jurors whether race would affect their judgment concerning credibility, but did allow

the accused to ask whether race could impair judgment generally). Moreover, I believe the asking of the rejected questions would improperly tip the delicate balance which maintains an impartial trial atmosphere, and instead tend to create an impermissible cloud of prejudicial suggestions and implications.

A court need not approve every question a defendant desires to ask on voir dire, even if the Commonwealth, as here, does not object. To ensure a fair trial, the court has an independent obligation to determine the propriety of questions. Section 5.1 of the ABA Standards for Criminal Justice, Standards Relating to the Function of the Trial Judge (Approved Draft, 1972), provides:

*"Conduct of voir dire examination of jurors*

The judge should initiate the voir dire examination by identifying the parties and their respective counsel and by referring to the charge against the accused, and by putting to the prospective jurors questions touching their qualifications, including impartiality, to serve as jurors in the case. The judge should also permit such additional questions by the defendant or his attorney and the prosecutor as he deems reasonable and proper."

The Commentary to this Section points out:

"This standard is intended to preclude use of voir dire for such extraneous purposes as predisposing jurors favorably or unfavorably towards or against the defendant, the government, counsel, or anyone else. Nevertheless, in permitting use of voir dire to determine whether to challenge peremptorily, the standard is open to abuse unless the trial judge exercises careful control."

Accord, ABA Standards for Criminal Justice, Standards Relating to Trial by Jury § 2.4 (Approved Draft, 1968). The trial court can discharge this responsibility fairly and effectively only if it considers all relevant facts, including courtroom atmosphere, the nature of the offense, potential composition of the jury, and characteristics of the accused.

Recognizing the "superiority of his nether position" and because "he sees more and senses more," M. Rosenberg, "Judicial Discretion of the Trial Court, Viewed From Above," 22 Syracuse L.Rev. 635, 663 (1971), quoted in *Del Piano v. United States*, 575 F.2d 1066 (3d Cir. 1978), our cases afford the trial court broad discretion in controlling voir dire. See e. g., *Commonwealth v. Johnson*, 452 Pa. 130, 305 A.2d 5 (1973).

The majority not only approves prejudicial questions, but also interferes with the trial court's exercise of its sound discretion by failing to recognize that important, on-the-scene considerations may have shaped the trial court's decision to limit appellant's inquiry on voir dire. Recognizing and understanding the courtroom atmosphere surrounding this crime and the prejudicial impact of these additional questions, and having already allowed the accused to probe this area of prejudice without introducing extraneous considerations, the trial court could reasonably and properly conclude that nothing in the additional questions could promote a fair trial.*

Nothing in this record establishes, or even suggests, that appellant did not have a fair trial before an impartial and properly selected jury. In holding to the contrary, the majority engages in nothing more than speculation, substituting its own assessment of proposed questions for that of the trial court. Finding no error of law or abuse of discretion in the court's rulings on proposed questions for voir dire, no merit in appellant's allegations of trial error, and sufficient evidence to support a verdict of murder of the first degree, I would affirm the judgment of sentence.

* The majority's attempted analogy to proposed points for charge underscores its failure to consider and respect the important factors which require a trial court to enjoy discretion on voir dire. In reviewing the trial court's ruling on points for charge, an appellate court is guided by legal principles as applied to facts of record to a far greater extent than in reviewing questions for voir dire, where courtroom considerations not always of record play a crucial role in guiding the court's discretion.