**Norfolk**

NATHANIEL REYNOLDS

v.

COMMONWEALTH OF VIRGINIA

No. 0517-86

April 5, 1988

COUNSEL

Eileen A. Olds, for appellant.

M. Katharine Spong, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**KOONTZ, C.J.** — Nathaniel Reynolds was found guilty in a jury trial of rape and sentenced to serve twelve years in the penitentiary. On appeal, we decide whether the trial court erred in denying defense counsel's request for a specific *voir dire* question directed to racial prejudice. Although we find that special

circumstances existed in this case such that Reynolds was entitled to question the jury as to any potential racial prejudice they may have harbored, we believe the trial judge properly refused the specific question tendered by Reynolds. Finding that the burden was upon Reynolds to submit proper questions directed to racial prejudice, and that no such questions were tendered, we affirm Reynolds' conviction.

## I.

The victim is a married, white female who was thirty years old at the time of trial. Reynolds, a black male, was thirty-five years of age at the time of trial. The victim testified that she was abducted near an after-hours private club during the early morning hours of July 7, 1985, taken against her will to a secluded area in the city of Chesapeake, Virginia, and forcibly raped. Reynolds maintains that the actions of the victim were voluntary and that the sexual intercourse was consensual.

The facts recited below are based upon the testimony of the victim and, upon familiar principles, will be presented in the light most favorable to the Commonwealth. After the victim left the club and got into her car, Reynolds, who was hiding in the back seat, reached over the seat and grabbed her. The victim testified that, after driving a short distance, Reynolds instructed her to pull over and stop the car. While maintaining a grasp on the victim's hair, Reynolds pushed her aside, leaped over the seat, and got into the driver's seat. Reynolds said: "You want to run? . . . go ahead, run. Go ahead, unlock the door, get out and run . . . . Nobody is going to help you. Do you know where you are?" Reynolds and the victim were in a black neighborhood.

While driving around nearby Portsmouth, Reynolds maintained a grasp on the victim. The victim testified they drove to the Trego Stone Corporation, which is located in a deserted area. Reynolds removed the keys from the car, and walked over to a ditch to urinate. The victim exited the car and attempted to run away; however she stumbled and Reynolds caught her. The victim testified that they then drove by a neighborhood "nip joint" and a black man walked from a house and through the window handed Reynolds a bottle of beer and a paper cup containing white liquid. The victim testified that Reynolds stated: "Go ahead, get out and run.

Go ahead, scream. Do anything you want. You think anybody around here is going to help you. They are going to help me. They are not going to help you." Reynolds then told the victim they were going to the "swamp" to "have our fun." Reynolds advised the victim she could not get away because "she was a white woman in the middle of nigger town and nobody would help [her]." Reynolds stopped the car in a wooded area, forced the victim to remove her clothing, and raped her.

The victim further testified concerning the following statements made by Reynolds during the course of the encounter. Reynolds purportedly placed a cigarette in his mouth and handed it to the victim. When the victim refused to smoke the cigarette, Reynolds said: "The reason you don't want to smoke it is because my nigger lips have been on it . . . ." When the victim refused to drink from the beer can and cup of liquor obtained at the "nip joint," Reynolds stated: "[Y]ou don't want to drink it because it's had my lips on it. It had my nigger lips on it, and you don't want to drink it now because you're a white bitch and you don't want to drink after no nigger." Reynolds also stated just prior to the rape: "Before you die, you're going to have your black man and you're going to know what if feels like to have a nigger cock in you . . . ."

The trial court reviewed the proposed *voir dire* questions in chambers. Reynolds' attorney requested that he be allowed to ask the following question during *voir dire*: "Would any of the jurors, as a result of their background or experience, have a very difficult time believing that a married, attractive white woman would consent to sexual relations with a black man?" The Commonwealth objected on the grounds that the proposed question goes to whether the sexual act was consensual which is one of the ultimate questions of fact within the province of the jury and that allowing too many questions of this type would turn the "rape" case into a "race" case. Reynolds' attorney argued that, while the fact that sexual relations occurred was not in dispute, "some people [in the South] consider [interracial dating] extreme, unusual or even abhorrent." Consequently, counsel maintained that "without my ability to ask this question, I'm left with the great possibility that we're going to end up with some jurors here who have the kind of bias that's going to make it impossible for them to give a fair trial to this black man under the circumstances." Reynolds'

counsel then agreed to remove "attractive" from the question, leaving "married white woman." The trial court refused to permit the question as worded. The record fails to reveal that any other questions were submitted or that any alternative questions were requested. The trial court noted Reynolds' objection to the refusal to ask the proffered question.

The trial court then indicated that it would allow Reynolds' attorney to ask the following question: "There will be allegations here before you of both interracial and adulterous interracial sexual relations. Do any of you jurors, as a result of moral, personal or religious grounds, find the subjects too repugnant that it would be difficult for you *to sit on this jury*" (emphasis added). During *voir dire*, Reynolds' attorney actually worded the allowed question as follows:

Now, you are going to hear today allegations coming from both sides, to some extent, allegations of two things: interracial sexual relations and combined with that interracial adulterous sexual relations. Are there any of you that find these subjects so distasteful, so emotionally repugnant that you would have a difficult time *sitting through this. day or two-day trial in which these issues are discussed* (emphasis added).[1]

All of the jurors answered in the negative.

In addition, the court asked the following questions during *voir dire*:

Are any of you sensible of any bias or prejudice against the Commonwealth or the accused?

\* \* \*

Do you know of any reason whatsoever why you should not give a fair and impartial trial to the Commonwealth and to the accused based solely on the law and evidence in this

---

[1] While we note the obvious distinction between the responsibility of sitting as a juror and merely sitting in the courtroom, this distinction is not raised in this appeal. Furthermore, we believe it reasonable to assume that the question as actually worded by defense counsel would have been taken by the prospective jurors as meaning in their role as jurors.

case?

After Reynolds' attorney concluded his *voir dire*, a side-bar conference was held, and the court made one further inquiry of the jury:

Do any of you, because of the nature of the allegations or the persons allegedly involved, feel you would have a difficult time rendering a fair and impartial verdict based strictly on the law and the evidence and without regard to any such personal feelings you may have.

The jury answered each of these *voir dire* questions in the negative. The defendant was present in the courtroom during this exchange, and the jury was presumably aware of the fact that he was a black man.

In her opening statement, the Commonwealth's Attorney stated:

You know that [the appellant is] charged with rape, and this is a rape case, not a race case, even though, as you will find, there is a racial difference between the two parties. If race is an issue in this case, it is because of the things that this man said. And one of the things he said when they were stopped and he was trying to get his drinks is "you're in nigger town," and that is what he said. Not what [the victim] says, that is what he said. "You're in nigger town. You're a white girl in nigger town and nobody is going to help you here."

Reynolds asserts that the difference in race between himself and the victim became a prime tool used by the Commonwealth's Attorney to explain why the victim never tried to escape from him and ultimately that the sexual act was nonconsensual. Based on the assertion of the victim that she was taken exclusively through black neighborhoods during the course of the abduction and rape, Reynolds claims that the Commonwealth's Attorney emphasized that the victim believed that the people in these neighborhoods were Reynolds' friends and would not help her.

Reynolds further contends that the nature of the crime itself makes "it more ripe for inquiry into the potential racial prejudice" harbored by the jury. In no other circumstance, argues Reynolds,

is the issue of consent of the victim as pronounced or as crucial. Reynolds contends that the race of the parties is a prime factor to examine in determining whether sexual relations are voluntary. Therefore, race is a special circumstance in the instant case in determining whether consent was likely under the circumstances.

Finally, Reynolds argues that the instruction which the trial court allowed counsel to offer contained several limiting components. In summary, Reynolds asserts that the question allowed is addressed only to jurors who may be intolerant of interracial sex or would find it repugnant or distasteful, not those who believe intercourse between races would be nonconsensual. Reynolds concedes that the question would in a broad and general way exclude those who felt that the act was repugnant; however, he maintains it did not serve to reach those who believe that a married white woman is incapable of consenting to sex with a black man.

## II.

A criminal defendant is guaranteed an impartial jury by the sixth amendment to the United States Constitution, which is applicable to the states by virtue of the fourteenth amendment.[2] *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968); *United States v. Thompson*, 744 F.2d 1065, 1068 (4th Cir. 1984); *Briley v. Commonwealth*, 222 Va. 180, 184, 279 S.E.2d 151, 154 (1981). The principles of due process, embodied in the fourteenth amendment to the United States Constitution, also guarantee a defendant's right to an impartial jury. *Ristaino v. Ross*, 424 U.S. 589, 595 n. 6 (1976). "The constitutional and statutory guarantee of an impartial jury is no mere 'legal technicality,' but a substantive right scrupulously to be observed in the day-to-day administration of justice." *Martin v. Commonwealth*, 221 Va. 436, 445, 271 S.E.2d 123, 129 (1980). "*Voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the

---

[2] An accused is also entitled to an impartial jury under the Virginia Constitution, as a matter of legislative mandate, and by the Rules of the Virginia Supreme Court. *Scott v. Commonwealth*, 1 Va. App. 447, 451, 339 S.E.2d 899, 901 (1986). Reynolds' appeal, however, is based solely upon federal constitutional grounds. He has made no allegation the trial court failed to comply with Code § 8.01-358 or Rule 3A:14.

evidence cannot be fulfilled." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (citations omitted).

■ Reynolds properly concedes that the mere fact that an accused is black and the victim is white does not automatically mandate a right to pose *voir dire* questions to the jury designed to identify racial prejudice. *Lewis v. Commonwealth*, 218 Va. 31, 35-36, 235 S.E.2d 320, 323 (1977). Accordingly, the resolution of the issue raised by Reynolds requires a two-fold inquiry. First, we must decide whether there were "special circumstances" present in the case before us, such that Reynolds was constitutionally entitled to ask prospective jurors questions specifically directed to racial prejudice. Second, we must determine whether the trial court erred by not allowing Reynolds' single specific *voir dire* question. The United States Supreme Court has decided a number of cases which have addressed these issues. Nonetheless, those situations in which special circumstances are present remain unclear. To understand the present state of the law, a brief review of these decisions is helpful.

■ In *Ham v. South Carolina*, 409 U.S. 524 (1973), the Supreme Court decided whether the trial judge's refusal to examine jurors on *voir dire* as to possible racial prejudice violated the defendant's constitutional rights. The defendant, a well-known civil rights activist, was charged with possession of marijuana. His defense was that law enforcement officers had framed him because of his civil rights activities. *Id.* at 525. The Court held that "the essential fairness required by the Due Process Clause of the Fourteenth Amendment requires that under the facts shown by this record the petitioner be permitted to have the jurors interrogated on the issue of racial bias." *Id.* at 527.

Five years later in *Ristaino v. Ross*, 424 U.S. 589 (1976), the Supreme Court again addressed the issue. The defendant and two other blacks were tried in a state court for violent crimes against a white security guard. The trial judge refused to allow prospective jurors to be questioned about racial prejudice. Justice Powell, writing for the majority, explained and limited the parameters of *Ham*: "By its terms *Ham* did not announce a requirement of universal applicability. Rather, it reflected an assessment of whether under all of the circumstances presented there was a constitutionally significant likelihood that, absent questioning about racial prejudice, the jurors would not be as 'indifferent as [they stand]

unsworne.' " *Id.* at 596 (citation and footnote omitted). In distinguishing *Ham* from *Ristaino*, the Court stated: "Racial issues . . . were inextricably bound up with the conduct of [Ham's] trial" because of the defense he presented and his civil rights activities. *Id.* at 597. By its holding in *Ristaino* that *voir dire* directed to racial prejudice was not universally required, the Court refused to adopt a *per se* rule. "The mere fact that the victim . . . was a white man and the defendants were [blacks] . . . did not suggest a significant likelihood that racial prejudice might infect [the] trial." *Id.* at 597-98.

■ In *Rosales-Lopez v. United States*, 451 U.S. 182 (1981), a defendant of Mexican descent was tried in federal court on charges of illegally transporting aliens into the United States. Counsel for defendant submitted numerous questions to be asked by the trial judge during *voir dire*. The trial court refused to ask the questions directed specifically at possible racial or ethnic prejudice; however, it did ask a series of questions directed at juror attitudes concerning aliens and the court made a general inquiry into prejudice. The Supreme Court noted: "Only when there are more substantial indications of a likelihood of racial . . . prejudice affecting the jurors in a particular case does the trial court's denial of a defendant's request to examine the jurors' ability to deal impartially with this subject amount to an unconstitutional abuse of discretion." *Id.* at 190.

The Court explained that "[t]he critical factor present in *Ham* but not present in *Ristaino*, was that racial issues were 'inextricably bound up with the conduct of the trial,' and the consequent need, under all circumstances, specifically to inquire into possible racial prejudice in order to assure an impartial jury." *Id.* at 189 (citation omitted). As the Court further explained: "Absent such circumstances, the Constitution leaves it to the trial court, and the judicial system . . . to determine the need for such questions." *Id.* at 190.

■ Recently, in *Turner v. Murray*, 476 U.S. 28 (1986), the Supreme Court held that a defendant accused of an interracial capital crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias. The Court stated that *Turner* differed from *Ristaino* because in addition to having a black defendant and a white victim, Turner was charged with a capital offense. The Court's judgment and con-

comitant finding of special circumstances was based upon three factors: the crime charged involved interracial violence, the broad discretion given the jury at the death penalty hearing, and the special seriousness of the risk of improper sentencing in a capital case. *Id.* at 37. The Court reaffirmed the holding of *Ristaino* and held "that absent 'special circumstances' that create a particularly compelling need to inquire into racial prejudice, the Constitution leaves the conduct of voir dire to the sound discretion of state trial judges." *Id.* at 38 n.12.

Under these guiding principles, we must determine whether, under the facts of the case before us, there are special circumstances such that there was a "particularly compelling need" to inquire into racial prejudice or whether there is a "constitutionally significant likelihood that, absent questioning about racial prejudice, jurors will not be indifferent as they stand unsworn." *Id.* at 35.

The mere fact that a black defendant is charged with committing a violent crime against a white victim does not, by itself, create special circumstances of constitutional proportions. *Ristaino*, 424 U.S. at 597; *Lewis*, 218 Va. at 35-36, 235 S.E.2d at 323. Nor can we say because the crime charged is interracial rape that denial of a defendant's request to question prospective jurors regarding racial prejudice violates his constitutional rights. *Dukes v. Waitkevitch*, 536 F.2d 469, 471 (1st Cir.), *cert. denied*, 429 U.S. 932 (1976). Furthermore, the fact that a black defendant asserts a consent defense to the charge of rape does not, by itself, create special circumstances such that he is entitled to *voir dire* directed at racial prejudice. *See Commonwealth v. Richardson*, 504 Pa. 358, 363, 473 A.2d 1361, 1363 (1984). However, where the evidence presented at trial emphasizes the race of the defendant, the prejudicial impact on the jurors becomes more meaningful. *Commonwealth v. Christian*, 480 Pa. 131, 137 n.6, 389 A.2d 545, 548 n.6 (1978).

Numerous courts have concluded that the factors enumerated above do not, by themselves, pose special circumstances. However, we believe there comes a point where these factors—the race of the defendant and victim, the nature of the crime charged and defenses asserted, the circumstances of the trial, and the nature of the evidence produced at trial—create a compelling need to inquire into racial prejudice. We believe that threshold was reached

in this case because there were substantial indications that racial prejudice may have affected the jurors and, therefore, infected the trial.

The record is replete with racial epithets. The Commonwealth's chief witness, the victim, testified repeatedly concerning statements made by Reynolds which could have aroused and inflamed feelings of racial prejudice. The racial difference between the victim and Reynolds was used by the Commonwealth to show why the victim failed to attempt to escape and failed to alert others of her abduction when the opportunity presented itself. *Cf. Commonwealth v. Christian*, 480 Pa. at 137, 389 A.2d at 548 (racial difference between defendant and victim emphasized by Commonwealth's trial strategy rendered case racially sensitive). The evidence adduced at Reynolds' trial contained racial overtones which became intertwined with the issues. Furthermore, we are not unmindful that "interracial rape may be a classic catalyst of racial prejudice . . . ." *Dukes*, 536 F.2d at 471 (nonetheless holding that in prosecution of black defendant for rape of white victim that prejudice inheres in the identities of the parties and victim and not in specific issues). Because of the interjection of racially inflammatory evidence at the trial, the case before us became racially sensitive and presented special circumstances of constitutional proportions. Thus, we believe that had Reynolds submitted proper questions to be asked of prospective jurors, he would have been entitled to have his request granted.

■ We emphasize that we are not adopting a *per se* rule of universal applicability. There are very few reported decisions that have found the presence of special circumstances which constitutionally mandate *voir dire* directed at racial prejudice. However, even in those cases that have found special circumstances lacking, courts have commented that it is certainly the wiser and more prudent course to grant a defendant's request to question prospective jurors concerning any latent racial prejudice they may harbor. *See, e.g., Rosales-Lopez*, 451 U.S. at 191 (it is usually best to honor the defendant's request); *Ristaino*, 424 U.S. at 597 n.9 (although not always constitutionally required, it is generally the wiser course to propound appropriate questions if requested by the defendant); *Commonwealth v. Sanders*, 383 Mass. 637, 639, 421 N.E.2d 436, 437 (1981)(when a defendant moves to interrogate prospective jurors as to possible prejudice, the trial judge should

grant the motion).

█ Courts refusing such questions have reasoned that asking too many questions along the lines of racial prejudice may create the risk of giving the impression that justice may depend upon the color of one's skin. *See, e.g., Rosales-Lopez*, 451 U.S. at 190. Other decisions have asserted that, by posing questions directed at racial prejudice, trial courts risk creating racial issues where none would otherwise exist. *See, e.g., Commonwealth v. Richardson*, 504 Pa. at 364, 473 A.2d at 1364. We can only speculate as to what effect, if any, asking such questions in a given set of circumstances may have upon a jury. However, when weighing the risk of emphasizing racial issues against the right to question a prospective jury on their potential racial beliefs and the corresponding protection of the defendant's right to an impartial jury, we believe the trial court should readily accede to the defendant's request to pose such questions. Asking such questions would be minimally intrusive and would consume little of the court's time. Certainly, if a defendant consciously chooses, as a strategic matter, to submit such questions which may highlight the presence of racial issues in a trial, the defendant bears any risk associated with emphasizing race as an issue. "Before granting the motion, the trial judge should carefully ascertain that the defendant's decision to insist on specific questions regarding racial bias was a knowing and voluntary one, made with an understanding that such specific questions may activate latent racial bias in certain prospective jurors or may insult others without uncovering evidence of bias . . . ." *Commonwealth v. Sanders*, 383 Mass. at 641, 421 N.E.2d at 438-39. We further emphasize, however, that a judge is not required to grant a defendant's request when there is no rational possibility of racial prejudice and, "the trial judge retains discretion as to the form and number of questions on the subject . . . ." *Turner v. Murray*, 476 U.S. at 37.

Notwithstanding our finding of special circumstances in this case, we must decide the narrow issue whether the trial court erred in refusing the single question submitted by Reynolds, which in substance inquired whether the jury believed it would be improbable for a married white woman to consent to sexual relations with a black man.

█ "The Constitution does not always entitle a defendant to have questions posed during *voir dire* specifically directed to

matters that might prejudice veniremen against him. *Voir dire* 'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.' " *Ristaino*, 424 U.S. at 594 (citations omitted). "This is so because the 'determination of impartiality, in which demeanor plays such an important role, is particularly within the province of the trial judge.' " *Id.* at 594-95 (citation omitted). "A party has no right, statutory or otherwise, to propound any question he wishes . . . . The court must afford a full and fair opportunity to ascertain whether prospective jurors 'stand indifferent in the cause,' but the trial judge retains discretion to determine when the parties have had sufficient opportunity to do so." *LeVasseur v. Commonwealth*, 225 Va. 564, 581, 304 S.E.2d 644, 653 (1983), *cert. denied*, 464 U.S. 1063 (1984).

We agree with the Commonwealth that the trial court properly refused to allow the specific question proposed by Reynolds. Reynolds' trial counsel argued that the question was directly related to the facts of this case and that because of the infrequency of interracial dating, some members of the jury could possibly consider interracial dating "extreme, unusual, or even abhorrent."[3]

█ The question was improper because it went to an ultimate issue of fact: whether the victim consented to sexual relations with Reynolds. The question required the jury to speculate on evidence to be produced at trial. *See Poyner v. Commonwealth*, 229 Va. 401, 414-15, 329 S.E.2d 815, 825-26 (1985). Furthermore, the question was designed to probe a juror's present impression of facts which were to be later developed at trial. *See Commonwealth v. Christian*, 480 Pa. at 139, 389 A.2d at 549. Finally, we believe the question was not likely to have elicited a response suggestive of bias and prejudice and, as such, was irrelevant. *See LeVasseur*, 225 Va. at 581, 304 S.E.2d at 653.

█ A trial court's conduct of *voir dire* and finding of juror impartiality is entitled to great weight and will not be disturbed unless manifest error is apparent. *Wilson v. Commonwealth*, 2 Va. App. 134, 137, 342 S.E.2d 65, 67 (1986). The court properly refused the question as posed.

---

[3] We note that the one question allowed by the trial court as worded addressed these concerns raised by Reynolds' trial counsel during argument on the *voir dire* questions.

█ When the trial court refused to allow the proposed *voir dire* question, counsel did not proffer alternative questions or offer to rephrase the question tendered. "A defendant cannot complain of a judge's failure to question the venire on racial prejudice unless the defendant has specifically requested such an inquiry." *Turner v. Murray*, 476 U.S. at 37. "In absence of a request to the state trial court that voir dire questioning on racial prejudice be allowed, [a] claim does not rise to constitutional dimension." *Braxton v. Estelle*, 641 F.2d 392, 395 (5th Cir. 1981). "The motion for interrogation of prospective jurors as to racial prejudice 'should come from the defendant himself.'" *Commonwealth v. Sanders*, 383 Mass. at 641, 421 N.E.2d at 438 (citation omitted).

█ Although "[i]t is the trial judge's duty to impanel jurors who are free from bias and prejudice against the parties," *Wilson*, 2 Va. App. at 137, 432 S.E.2d at 67, it is defense counsel's duty to propose relevant, proper questions designed to probe for any racial prejudice the prospective jury may harbor.[4] If defense counsel declines to make such a request, the judge is not required to "broach the topic *sua sponte*." *Turner v. Murray*, 476 U.S. at 37 n.10.

Under the facts of this case, it is significant that while defense counsel did not propose additional *voir dire* questions, the trial court in addition to several general questions asked an additional question designed to probe for possible racial prejudice. Because the specific question offered by Reynolds was improper and was correctly refused by the trial court, and because defense counsel failed to offer any other proper questions, we find that the trial court did not commit reversible error, especially in view of the trial court's action in posing an additional question designed to probe for racial prejudice. We, therefore, affirm the decision below.

*Affirmed.*

Baker, J., and Keenan, J., concurred.

---

[4] In a case of this nature where special circumstances exist, a question embodying the concept of whether the jury believed an individual of one race is more credible or inherently more worthy of belief would have been such a relevant and proper question that would not have gone to the ultimate fact at issue.