756 P.2d 573
**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Lawrence ESPINOSA, Defendant–Appellant.**

**No. 17237.**

Supreme Court of New Mexico.

June 16, 1988.

Ransom, J., filed specially concurring opinion.

Jacquelyn Robins, Chief Public Defender, Sheila Lewis, Asst. Public Defender, Santa Fe, for defendant-appellant.

Hal Stratton, Atty. Gen., Patricia A. Gandert, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

SOSA, Senior Justice.

Defendant-appellant, Lawrence Espinosa, appeals his conviction on June 10, 1987, by a jury sitting in the second judicial district, of the following crimes: (1) kidnapping, with firearm enhancement; (2) false imprisonment, with firearm enhancement; (3) attempted armed robbery; and (4) felony murder. Espinosa was sentenced to a term of life imprisonment plus fifteen and one-half years imprisonment. On appeal Espinosa raises the following issues: (1) that he was denied due process of law by the trial court's refusal to allow him to inquire during voir dire as to the prospective jurors' attitudes toward the fact that he probably would not testify during the trial; (2) that the trial court erred in refusing to grant his motion for mistrial following the testimony of his co-conspirator as to another crime that Espinosa had allegedly committed after his commission of the crimes at issue here; (3) that the trial court erred in allowing testimony by Espinosa's stepfather concerning Espinosa's request to the stepfather to dispose of a gun that was admittedly not used in the perpetration of the crimes; and (4) that the trial court supposedly violated double jeopardy protection guaranteed to Espinosa by imposing two firearm enhancements for two of the crimes, rather than by imposing one firearm enhancement for the entire series of crimes. For the reasons stated below, we affirm the verdict, judgment and sentence of the trial court.

FACTS

It is to be noted at the outset that Espinosa does not contest on appeal the factual issues determined by the jury, and thus we take those facts as undisputed. On January 11, 1987, Espinosa and his co-conspirator Simon Aragon attempted to rob the Howard Johnson's Midtown Motel in Albuquerque. Aragon drove Espinosa in his (Aragon's) car to the scene of the crime and waited outside while Espinosa entered the establishment through the rear door of the kitchen after the restaurant of the motel had closed (11:00 p.m.). Upon seeing Espinosa enter the kitchen area with a gun drawn and pointed at the temple of the assistant manager, several waitresses, a dishwasher, and the assistant manager herself either screamed or ran toward the lounge of the motel. A patron of the lounge, Oscar Barrajas, attempted to attack Espinosa. A fight ensued, and Barrajas was killed by two shots fired by Espinosa: one shot propelling a bullet into Barrajas' left shoulder from a distance of less than two inches, and a second shot propelling a bullet into Barrajas' back while Barrajas was lying sprawled face down on the floor. Prior to the second shot, Aragon had entered the lounge and saw Espinosa standing over the body of Barrajas. He saw Espinosa shoot Barrajas in the back, grabbed Espinosa, and urged him to flee. The two men left the motel without completing the robbery.

The police traced Aragon's car through descriptions given by eye witnesses, and arrested Aragon on January 13, charging him with attempted robbery and murder. Aragon eventually negotiated a plea bargain, and turned state's evidence against Espinosa at trial. Espinosa does not challenge the veracity of Aragon's testimony. Part of that testimony concerned two guns Espinosa had shown Aragon on the day of the crimes—a .38 caliber revolver, and an antique pirate pistol. Espinosa himself was not indicted for the crimes involved here until January 28.

Between the time of the attempted robbery of the motel and his indictment, either late during the night of January 13 or early during the morning of January 14, Espinosa allegedly attempted to assault a cab driver. Police detective Cantwell, on redirect examination by the prosecution at trial, alluded to this event by answering the prosecutor's questions as to Espinosa's treatment in the emergency room of a hospital on the night of January 13, thusly: "[B]efore he had the cabby pick him up. The cabby picked him up at St. Joseph's Hospital." Espinosa contends on appeal that this testimony was elicited deliberately and for the explicit purpose of pointing the jury's attention to Espinosa's commission of another crime. Espinosa also contends that the testimony of Espinosa's stepfather, to the effect that Espinosa had called the stepfather from jail to ask him to dispose of the pirate pistol, was irrelevant and prejudicial, and that it deprived Espinosa of a fair trial. The State contends that the stepfather's testimony was introduced for the sole purpose of corroborating Aragon's testimony that Espinosa had shown Aragon the pistol, and thus relevant evidence tending to prove Aragon's truthfulness.

Espinosa moved for a mistrial after Aragon testified in the following words on direct prosecutorial examination as to whether he saw Espinosa in jail on January 13: "He said he was arrested for trying to rob a taxicab or assaulting a taxicab or something like * * *" at which point defense counsel made its motion for mistrial. Counsel contended that the testimony was deliberately elicited in violation of an agreement that Aragon would not say anything about any other crime in which Espinosa was involved. Counsel stated to the court that no curative instruction could erase from the jurors' minds what they had just heard. The State contends that it had agreed only to keep evidence of *prior* criminal conduct from the jury, and that Aragon's testimony as to the taxicab incident was spontaneously uttered, and not deliberately elicited by the prosecutor.

The following conversation occurred on the record out of the presence of the jury:

[*Defense Counsel Kelly*]: Your Honor, I object on the grounds that I thought it had been covered in pretrial, and that, prior to trial, and that [prosecutor] Mr. Martinez had informed the Court and us that he had talked with the witness about not talking about arrests and records of Mr. Espinosa * * *. Mr. Aragon has now testified that he was arrested for robbery of a taxicab driver, (sic) I think that is a prejudicial statement that can't be cured. And as a result of that, I would move for mistrial based upon the response of the witness.

[*Mr. Martinez, prosecutor*]: Your Honor, there is (sic) all types of prejudicial thinking around in this case, and I think one thing that's interesting is that the Defense (sic) didn't bother to file a single Motion in Limine (sic) to attempt pretrial, to exclude any of this evidence. Your Honor I agreed * * * that there was no way that we were going to develop any prior record of his, and we haven't. The defense knows and the Court (sic) was present during the—this information that just came out, and the defense just sat on their hands knowing that it was coming out and hoping that it would so that they could make this motion. Now, they complain and ask for a curative instruction or mistrial, but Your Honor, there was never an agreement by the State that we wouldn't mention this. It was never raised by the defense and how, then, could I respond to it? We simply agreed to the severance of Count V in the fact that we wouldn't be mentioning this man's prior record, and we haven't.

 * * * * * *

[*The Court*]: Well, I think the State in this case has bent over backwards to try to protect the defendant from the disclosure of his prior record and any other involvement he may have had with the law preceeding this incident * * *. [W]ith respect to this special, this particular charge of him getting involved in some kind of a stabbing or slicing or whatever of the cab driver which caused him to be in jail on January 14th, I think the State has tried to avoid that as well. In view of the stipulation that was entered into on the * * * reason for his being in jail, I think Mr. Martinez in questioning Mr. Aragon here tried to keep him from saying anything about that * * *. It would have been very easy for you to jump up, Mr. Kelly, and say, "I think he is going to say something," or "I would like to approach the Bench," or interrupt his rambling conversation in response to Mr. Martinez's prior question, but you didn't. You waited and waited and finally it did come out, and now you just up and ask for a mistrial so I am going to continue your request for mistrial, and we'll just go on from there. (Emphasis added.)

## LEGAL ISSUES INVOLVED

(1) WAS DEFENDANT DENIED DUE PROCESS OF LAW BY THE TRIAL COURT'S REFUSAL TO ALLOW HIM TO QUESTION PROSPECTIVE JURORS ON VOIR DIRE AS TO THEIR SENTIMENTS CONCERNING ESPINOSA'S PROBABLE REFUSAL TO TESTIFY? OUR HOLDING IS THAT HE WAS NOT.

 We need not discuss the preponderance of cases cited by Espinosa in his brief-in-chief concerning this issue because these cases pertain to the question of trial courts abusing their discretion in disallowing defense attorneys to inquire during voir dire into issues of *fact*. Here, Espinosa's counsel wanted to inquire into an issue of *law* —namely, whether the prospective jury would hold it against Espinosa that he exercised his Fifth Amendment right not to take the stand and testify on his own be-

half. A trial court does not abuse its discretion in refusing to allow defense counsel to question prospective jurors on propositions of law. *Grandsinger v. United States*, 332 F.2d 80 (10th Cir.1964). The trial court had discretion to direct the voir dire as it saw fit, *State v. Trujillo*, 99 N.M. 251, 657 P.2d 107 (1982), and the court did not abuse its discretion in instructing trial counsel as follows:

[*The Court*]: The only special rules I normally have is I don't like you to get into the law on your Voir Dire Examination (sic) * * *. A juror doesn't have to come in here knowing any law at all.
[*Defense Counsel*]: I understand.

\* \* \* \* \* \*

[*Defense Counsel*]: Since you raise that, Judge, I think I have a specific question * * *. I want to ask a general question of the entire panel, and I want to say, "Ladies and Gentlemen, the Defendant (sic) in this case is not going to testify, or probably is not going to testify. At the conclusion of the case, the Judge (sic) is going to tell you that you can't hold that against him in any way, and you can't use it in your discussion." I am going to ask * * *.
[*The Court*]: That's exactly what I don't think you ought to be entitled to do because we are getting into an argument on the law * * * and I will instruct them on the law at that time. There is that instruction, but I think that doesn't have a thing to do with Voir Dire Examination (sic) * * *.
[*Defense Counsel*]: *All right*. (Emphasis added.)

Defense counsel did not object and the correct proposition of law makes this a discretionary issue, reversible only for abuse.

(2) DID THE TRIAL COURT ERR IN DENYING ESPINOSA'S MOTION FOR MISTRIAL? OUR HOLDING IS NO.

 Prior to trial, and out of the presence of the jury, the following exchange occurred:

[*Defense Counsel*]: Mr. Aragon know[s] Mr. Espinosa through criminal enter-

prise, and it would naturally give testimony about when he got out of the joint, or, you know, or those sorts of things, and I think that we ought to be able to avoid that.

[*The Court*]: We can always do a little offer out of the hearing of the jury, if you know you are getting into something like that. You know the rule is, is that stuff is not inadmissible, if it's in the necessary context in the Plaintiff's (sic) case * * * as long as it doesn't—is not done maliciously or intentionally or something such as that * * *. [S]o if you know we're getting into a problem, just come up and we'll—or you can object, if you know we're they're (sic) getting into it, and then we can send the jury out and hash it out a little bit and see if they can do it some easier way.

Espinosa argues that Aragon's and Cantwell's damaging statements were deliberately induced by the prosecution. Our reading of the record leads us to the opposite conclusion, namely, that the damaging statements were spontaneously made and could have been prevented if defense counsel had acted more diligently in objecting or in otherwise making known to the court his opposition to the drift of the testimony. Thus, since Espinosa cites cases in his brief-in-chief which stand for the proposition that a prosecutor may not deliberately induce a witness to give testimony of a defendant's criminal record, we need not discuss those cases here, as they are inapposite. Instead, our decision is governed by *State v. Nichols*, 104 N.M. 74, 717 P.2d 50 (1986), in which we held that a defendant is not entitled to mistrial following a State witness' unsolicited statement concerning the defendant's criminal record, where defense counsel contends that a cautionary instruction would not cure any prejudicial effect which the statement may have had on the jury.

(3) DID THE TRIAL COURT ERR IN ALLOWING ESPINOSA'S STEPFATHER TO TESTIFY AS TO THE ANTIQUE PIRATE PISTOL? OUR RESPONSE: NO.

■ Evidence as to the pirate gun was deemed admissible to corroborate Aragon's testimony that Espinosa had shown him the gun. In his brief-in-chief, Espinosa contends that SCRA 1986, 11–608, pertaining to the character of a witness, is somehow pertinent to this issue. In actuality, neither Aragon's character nor conduct is the issue here, but the relevance of the testimony as to the pirate pistol. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." SCRA 1986, 11–401. Testimony as to the pirate pistol comports with this definition in that it tended to corroborate Aragon's earlier testimony. Under the rule in *Casaus v. State*, 94 N.M. 58, 607 P.2d 596 (1980), the state may not introduce into evidence a handgun not used in the perpetration of a crime for which the defendant is charged if the State does so to link the defendant to the commission of another crime. Here, it was obvious to everyone, the jury included, that testimony as to the antique pirate pistol was not being introduced to link Espinosa to the commission of any crime.

(4) DID THE TRIAL COURT ERR IN IMPOSING TWO SEPARATE SENTENCES FOR FIREARM ENCHANCEMENT RATHER THAN ONE? OUR RESPONSE: NO.

■ In arguing this point, Espinosa relies on *State v. Ellis*, 88 N.M. 90, 537 P.2d 698 (Ct.App.1975), decided under a previous statute which the legislature has since fundamentally altered. *See* NMSA § 1978 31–18–16 (Repl.Pamp.1987), amending the prior law as it existed *after* the decision in *Ellis*, NMSA 1953, Section 40A–29–3.1. Whether one follows Section 31–18–16 (the present law), or NMSA 1953, Section 40A–29–3.1 (the law arguably in effect on the night of the crimes commited here), *Ellis* plainly does not apply. Instead, the case which governs our decision is *State v. Kendall*, 90 N.M. 236, 561 P.2d 935 (Ct.App.), *rev'd in part on other grounds*, 90 N.M. 191, 561 P.2d 464 (1977), which held:

If the statute punishes for "use" of a firearm in committing a felony, the punishment is to be applied for each felony committed by using a firearm * * *. New Mexico has * * * rejected the "single transaction" concept. *See State v. Tanton*, 88 N.M. 333, 540 P.2d 813 (1975).

*State v. Kendall*, 90 N.M. at 244, 561 P.2d at 943.

Hence the trial court did not err in applying the firearm enhancement statute to two of the crimes which Espinosa committed rather than applying one firearm enhancement sentence to "a unified course of events" as called for in *Ellis*, 88 N.M. at 93, 537 P.2d at 701. To the extent that *Ellis* is in conflict with *State v. Kendall* and NMSA 1978, Section 31–18–16, it is overruled.

For the foregoing reasons, we affirm the verdict, judgment and sentence of the trial court.

IT IS SO ORDERED.

SCARBOROUGH, C.J., concurs.

RANSOM, J., specially concurring.

RANSOM, Justice (specially concurring).

While I concur in the affirmance of the verdict, judgment and sentence of the trial court, I dissent from the rationale stated by the majority for holding that defendant was not denied due process in *voir dire*.

The fault in the proposed *voir dire* was that it invited the jury to speculate and it was arguably a veiled attempt to instruct upon and argue for the jury's application of a specific rule of law. It did not propose to discover what law the jury knew, as intimated by the court, but rather what the jury's state of mind might be after hearing the evidence and being instructed on the law. A distinction is to be drawn between a proper inquiry of fact structured to learn a juror's present state of mind as compared to a question that requires the juror to speculate what his/her state of mind might be after hearing the evidence and being instructed on specific law. A court reason-ably could preclude *voir dire* along the latter line.

In any event, what is determinative in this case is that, following the colloquy between court and defense counsel as set forth under Legal Issue (1), the court invited counsel to cite authority that the inquiry would be appropriate. Defense counsel responded that, "The only authority I'm aware of suggests that it's discretionary with the court." Having invited the court to exercise its discretion, defendant cannot now complain of the court's exercise of discretion in refusing to allow defense counsel to recite the law and to request that the jury speculate as to whether it would follow that law after hearing all the evidence. We need go no further in deciding this issue.