COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Raphael, Lorish and Callins
Argued at Lexington, Virginia

JAMAL DIVINE GARDNER

MEMORANDUM OPINION* BY
v.      Record No. 1036-22-3      JUDGE STUART A. RAPHAEL
DECEMBER 19, 2023

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF AUGUSTA COUNTY
W. Chapman Goodwin, Judge

Kevin E. Calhoun for appellant.

John Beamer, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Appealing his conviction for aggravated malicious wounding, Jamal Divine Gardner

argues that the trial court erred by refusing to let his counsel ask potential jurors their views

about race, gun violence, and the right of a defendant not to testify. Gardner also argues that the

prosecution failed to prove three elements of the offense under Code § 18.1-51.2(A): that he

acted with malice, that he had the intent "to maim, disfigure, disable or kill," and that the victim

suffered "permanent and significant physical impairment." Finding no merit in any of those

claims, however, we affirm.

BACKGROUND

On appeal, we recite the facts "in the 'light most favorable' to the Commonwealth, the

prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022)

(quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires that we "discard"

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

the defendant's evidence when it conflicts with the Commonwealth's evidence, "regard as true all the credible evidence favorable to the Commonwealth," and read "all fair inferences" in the Commonwealth's favor. *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

### A. Factual Background

In August 2020, Gardner was living in a camper next door to the home of Cassandra M. and Alvin C. The camper was parked on property owned by Alvin's grandmother, who had been married to Gardner's grandfather. Despite the marriage of the grandparents, Alvin testified that he did not have a close personal relationship with Gardner.

Cassandra and Alvin lived in the house with their children and with one of Cassandra's best friends, Raychelle A. Every other day or so, Gardner would drop by Alvin and Cassandra's home. But Gardner's behavior had become increasingly "strange." Gardner set up a cell phone on their front porch to take videos of people, and "[h]e was always talking about conspiracy theories and just rambled." Cassandra and Alvin "decided it was time for him to go, especially with . . . [their] kids there."

On August 2, 2020, Gardner borrowed Alvin's car to do laundry. That evening, Alvin, Cassandra, and Raychelle had been drinking and were celebrating Cassandra's birthday. When Gardner returned, Alvin told him that he needed to leave. But Gardner complained that he was missing his phone; he refused to leave without it. Alvin searched for the phone for about two hours, without any help from Gardner, until Alvin noticed that Gardner already had his phone; he was standing there holding it (along with two other phones that belonged to him). Alvin again asked Gardner to leave, but he stayed put. After another hour passed, Alvin picked up two bags containing Gardner's things and put them outside the front door.

When Alvin came back inside, Gardner lifted him off the floor and pushed him against a coat rack, knocking the wind out of him. Gardner then dragged Alvin out the back door and threw him "hard" down the steps. Alvin "balled up" on the ground to protect himself as Gardner repeatedly punched him. But Gardner used his knees to pin Alvin's arms to the ground, leaving Alvin's face and head unprotected. Alvin testified that Gardner had "way more muscle and mass than me"; he was "like a big old boulder sitting on top of me to where I couldn't . . . do anything." Alvin said the ordeal lasted five minutes, "just straight punching on the face." Alvin denied having threatened Gardner at any point before the assault.

Raychelle testified that, when she walked outside, she saw Gardner on top of Alvin, punching him in the face, which by then was "bloody." Raychelle grabbed the back of Gardner's shirt and screamed for him to stop, but Gardner persisted; he was "in a rage." Raychelle raced inside to get Cassandra, and they both ran back outside. By then, "Alvin was on the ground laying down on the sidewalk. He had his hands over his face and was in a fetal position," "groaning," his eyes closed. Just touching Alvin's face, Cassandra "got blood all over [her] hands."

Augusta County Sheriff's Deputy Tyler Kirby responded to Cassandra's 911 call at about 1:45 a.m. He saw Cassandra and Alvin on the ground outside the home. Gardner then walked up the driveway and approached Deputy Kirby. After documenting Alvin's injuries and speaking to the witnesses, Deputy Kirby arrested Gardner.

Two of the health-care professionals who treated Alvin's injuries at the hospital were qualified as experts at trial and testified about the extent of his injuries. Among other things, Alvin had suffered multiple facial bone fractures and required reconstructive surgery to support his eye.

*B. Voir dire*

During jury selection, the trial court questioned jurors on the subjects required by Rule 3A:14(a). No venireperson flagged any "bias or prejudice for or against . . . the Commonwealth or the accused," or any difficulty affording "a thorough and impartial trial to the Commonwealth and the accused based solely on the law and the evidence." In response to the trial court's additional questioning, none expressed any concern that the nationality, race, or religion of the parties or witnesses would affect their judgment. Gardner's counsel also asked several questions in voir dire. But the trial court denied his request to ask a series of questions relating to (1) whether any juror would draw an adverse conclusion about a defendant who did not testify, (2) whether any juror had any experience with gun violence, and (3) whether any juror might be influenced by beliefs about race, including if anyone thought that "black men tend to be more impulsive or undisciplined."

After the jury was seated and the Commonwealth presented its case, the trial court denied Gardner's motion to strike. The jury found Gardner guilty of aggravated malicious wounding. The trial court sentenced him to 20 years' incarceration, with 9 years suspended.

ANALYSIS

*A. Voir Dire Questions (Assignment of Error 1)*

Gardner argues that the trial court committed reversible error by denying his request to question the venire about firearms, race, and his right not to testify. He says that those questions sought to uncover potential bias, prejudice, partiality, and inability to follow the trial court's instructions. He claims that the trial court's rulings violated his rights under Code § 19.2-262.01 and "his constitutional right to due process."

"Absent a showing of 'manifest error,' we will not overturn the trial court's exercise of its discretion during voir dire." *Hopson v. Commonwealth*, 52 Va. App. 144, 152 (2008)

(quoting *Juniper v. Commonwealth*, 271 Va. 362, 401 (2006)).  That discretion encompasses "the exclusion of questions to the venire."  *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013).

The "trial court's discretion in excluding questions asked of the venire is limited by statute and the United States Constitution."  *Id.* at 214.  "The right of an accused to trial by 'an impartial jury' is a constitutional right."  *Breeden v. Commonwealth*, 217 Va. 297, 298 (1976) (quoting U.S. Const. amend. VI; Va. Const. art. 1, § 8).  And that "constitutional guarantee is reinforced by legislative mandate and by the rules of [our Supreme] Court: veniremen must 'stand indifferent in the cause.'"  *Id.* (quoting then-Code § 8-208.28 and then-Rule 3A:20(b)).

We start with the "legislative mandate."  *Id.*  "*Counsel* conducted voir dire is a statutory, not a constitutional, right."  *Charity v. Commonwealth*, 24 Va. App. 258, 265 (1997) (emphasis added).  Enacted three years ago, 2020 Va. Acts chs. 157, 588, Code § 19.2-262.01 regulates voir dire in a criminal case.  That statute consists of four sentences, with numbering added here for ease of reference:

> [1] In any criminal case, the court and counsel for either party shall have the right to examine under oath any person who is called as a juror therein and shall have the right to ask such person or juror directly any relevant question to ascertain whether the juror can sit impartially in either the guilt or sentencing phase of the case. [2] Such questions may include whether the person or juror is related to either party, has any interest in the cause, has expressed or formed any opinion, or is sensible of any bias or prejudice therein.  [3] The court and counsel for either party may inform any such person or juror as to the potential range of punishment to ascertain if the person or juror can sit impartially in the sentencing phase of the case.  [4] The party objecting to any juror may introduce competent evidence in support of the objection, and if it appears to the court that the juror does not stand indifferent in the cause, another shall be drawn or called and placed in his stead for the trial of that case.

Code § 19.2-262.01.  The language in the first and second sentences largely comes from Code § 8.01-358,[1] which applies to both civil and criminal cases.  *See, e.g.*, *Scott v. Commonwealth*, 1 Va. App. 447, 451 (1986) (noting that Code § 8.01-358 "is made applicable to criminal proceedings by Code § 19.2-260"), *aff'd*, 233 Va. 5 (1987).  In particular, the four categories of potential bias listed in the second sentence of Code § 19.2-262.01—"whether the person or juror is related to either party, has any interest in the cause, has expressed or formed any opinion, or is sensible of any bias or prejudice therein"—are identical to those in Code § 8.01-358.  That common phrasing traces to the predecessor version of both statutes, first enacted in 1853.  *See* 1852-53 Va. Acts ch. 27, § 23 (requiring the trial court upon motion of either party to inquire if a juror "is related to either party, or has any interest in the cause, or has expressed or formed any opinion, or is sensible of any bias or prejudice").

The principal difference between the criminal and civil statutes is the third sentence of Code § 19.2-262.01, which permits the court or counsel to inform a prospective juror of "the potential range of punishment to ascertain if the person or juror can sit impartially in the sentencing phase of the case."  That provision superseded *Commonwealth v. Hill*, 264 Va. 315 (2002), which had held that "neither the defendant nor the Commonwealth in a non-capital

---

[1] Code § 8.01-358 provides:

> The court and counsel for either party shall have the right to examine under oath any person who is called as a juror therein and shall have the right to ask such person or juror directly any relevant question to ascertain whether he is related to either party, or has any interest in the cause, or has expressed or formed any opinion, or is sensible of any bias or prejudice therein; and the party objecting to any juror may introduce any competent evidence in support of the objection; and if it shall appear to the court that the juror does not stand indifferent in the cause, another shall be drawn or called and placed in his stead for the trial of that case.
>
> A juror, knowing anything relative to a fact in issue, shall disclose the same in open court.

criminal prosecution has a constitutional or statutory right" to raise sentencing considerations in voir dire. *Id.* at 320.

Putting aside the new statutory right to inquire about sentencing considerations during voir dire,[2] neither the Commonwealth nor Gardner contends that the scope of permissible voir dire is otherwise different under Code §§ 8.01-358 and 19.2-262.01. Both sides cite cases interpreting Code § 8.01-358 in support of their construction of Code § 19.2-262.01. We therefore assume that the case law interpreting Code § 8.01-358 informs the meaning of Code § 19.2-262.01.

The statutory rights governing voir dire are "reinforced," *Breeden*, 217 Va. at 298, by Rule 3A:14 (formerly Rule 3A:20). That rule requires "*mandatory* questioning by the court as to seven potential grounds for juror exclusion." *Turner v. Commonwealth*, 221 Va. 513, 519 n.4 (1980) (emphasis added). The trial court "must question" the venire to determine whether a potential juror:

> (1) Is related by blood, adoption, or marriage to the accused or to a person against whom the alleged offense was committed;
>
> (2) Is an officer, director, agent or employee of the accused;
>
> (3) Has any interest in the trial or the outcome of the case;
>
> (4) Has acquired any information about the alleged offense or the accused from the news media or other sources and, if so, whether such information would affect his impartiality in the case;
>
> (5) Has expressed or formed any opinion as to the guilt or innocence of the accused;
>
> (6) Has a bias or prejudice against the Commonwealth or the accused; or

---

[2] *But see Bland-Henderson v. Commonwealth*, 77 Va. App. 250, 269 (2023) (finding that Code § 19.2-262.01 does not entitle counsel to inform the jury of a potential sentence "when the defendant has not requested jury sentencing"); *Rock v. Commonwealth*, 76 Va. App. 419, 432-33 (2023) (same).

> (7) Has any reason to believe the juror might not give a fair and impartial trial to the Commonwealth and the accused based solely on the law and the evidence.

Rule 3A:14(a). Here, the trial court's questioning of the potential jurors covered all seven of those areas.

Once the trial court conducts that mandatory examination, "the court, and counsel as of right, may examine on oath any prospective juror and ask any questions relevant to the qualifications as an impartial juror." *Id.*[3] "The test of relevancy is whether the questions relate to any of the four criteria set forth in the statute. If an answer to the question would necessarily disclose, or clearly lead to the disclosure of the statutory factors of relationship, interest, opinion, or prejudice, it must be permitted." *Powell v. Commonwealth*, 267 Va. 107, 143 (2004) (construing Code § 8.01-358) (quoting *LeVasseur v. Commonwealth*, 225 Va. 564, 581 (1983)).

Still, "[a] party has no right, statutory or otherwise, to propound any question he wishes, or to extend *voir dire* questioning *ad infinitum*." *LeVasseur*, 225 Va. at 581. "The court must afford a party a full and fair opportunity to ascertain whether prospective jurors 'stand indifferent in the cause,' but the trial judge retains the discretion to determine when the parties have had sufficient opportunity to do so." *Id.* In other words, "the trial judge retains discretion as to the form and number of questions on the subject." *Reynolds v. Commonwealth*, 6 Va. App. 157, 169 (1988) (quoting *Turner v. Murray*, 476 U.S. 28, 37 (1986)). When the trial court "affords ample opportunity to counsel to ask relevant questions and where the questions actually propounded . . . were sufficient to preserve a defendant's right to trial by a fair and impartial jury, we will

---

[3] A 1981 amendment to Code § 8.01-358 codified the "right" of counsel to ask questions of the venire "directly." 1981 Va. Acts ch. 280. "While the 1981 amendment makes mandatory the formerly discretionary right of counsel to question the prospective jurors directly, it has no effect on the nature of the questions which may be asked." *LeVasseur v. Commonwealth*, 225 Va. 564, 581 (1983). That same "right" of counsel to ask questions is repeated in Code § 19.2-262.01.

generally not reverse a trial court's decision to limit or disallow certain questions from defense counsel." *Thomas v. Commonwealth*, 279 Va. 131, 163 (2010) (quoting *Buchanan v. Commonwealth*, 238 Va. 389, 401 (1989)). "The objecting party bears the burden of demonstrating that the trial court abused its discretion in limiting the scope of *voir dire*, and must show that the jury panel lacked impartiality or that the jury selection process the court employed was prejudicial." *Skipper v. Commonwealth*, 23 Va. App. 420, 427-28 (1996).

With those background principles in mind, we turn to Gardner's specific claims.

*1. Questions about Gardner's privilege against self-incrimination*

Gardner's proposed questions 6, 7, 8, and 9 sought to probe the potential jurors' understanding of a criminal defendant's constitutional privilege against self-incrimination and concomitant right not to testify:

> 6. Does anyone believe that in a case involving aggravated malicious wounding, the defendant should testify in court?
>
> 7. How many of you believe that you would need to hear from the defendant in these allegations in order to find him or her not guilty?
>
> 8. If Jamal were not to testify in his own defense, how many of you would draw a negative inference from that fact or consider his failure to testify as an indication of guilt?
>
> 9. Does anyone here feel like if a defendant doesn't testify it's at least partly because they are trying to hide something?

Gardner argues that he should have been allowed to ask these questions to reveal and clarify any misconceptions by jurors about his right not to testify. He claims that the trial court's refusal to let him ask those questions violated both Code § 19.2-262.01 and his constitutional right to due process.

Courts in other jurisdictions are divided about the extent to which a criminal defendant has a constitutional or statutory right to question potential jurors in voir dire about their

understanding of the defendant's privilege against self-incrimination and right not to testify.[4]

We do not reach Gardner's constitutional argument, however, because it has been doubly

defaulted. Gardner's brief did not cite any legal authorities in support of his constitutional claim.

"Rule 5A:20(e) requires that the appellant's opening brief include 'principles of law and

authorities' supporting each assignment of error." *Moncrieffe v. Deno*, 76 Va. App. 488, 503

(2023) (quoting Rule 5A:20(e)). Because Gardner's "failure to cite any supporting legal

authority is 'significant,' we treat his argument as defaulted." *Id.* (quoting *Conley v.

Commonwealth*, 74 Va. App. 658, 682 (2022)).

Gardner also defaulted the constitutional argument by failing to argue below that the trial

court would violate his constitutional rights if it refused to permit him to ask these questions.

Rule 5A:18 provides that "[n]o ruling of the trial court . . . will be considered as a basis for

reversal unless an objection was stated with reasonable certainty at the time of the ruling, except

for good cause shown or to enable this Court to attain the ends of justice." "This

contemporaneous-objection requirement affords 'the trial court a fair opportunity to resolve the

---

[4] Some jurisdictions afford the defendant a right to have jurors questioned about their understanding of the defendant's right not to testify. *See, e.g.*, *People v. Glasper*, 917 N.E.2d 401, 409-11 (Ill. 2009); *Hayes v. Commonwealth*, 175 S.W.3d 574, 585-86 (Ky. 2005); *State v. Hayes*, 364 So. 2d 923, 924-25 (La. 1978); Mass. Gen. Laws ch. 234A § 67A (2016); *Kazadi v. State*, 223 A.3d 554, 573-75 (Md. 2020) (collecting cases); *State v. Newton*, 465 S.W.3d 919, 928-30 (Mo. Ct. App. 2015); *State v. Cere*, 480 A.2d 195, 198 (N.H. 1984). Courts in these jurisdictions typically apply harmless-error analysis, however, when that right is violated. *See, e.g.*, *State v. Jordan*, 281 A.3d 129, 142 (Md. 2022); *Glasper*, 917 N.E.2d at 417-18; *Newton*, 465 S.W.3d at 928-30. *But see Hayes*, 175 S.W.3d at 586 ("[T]he failure to permit counsel to ascertain during voir dire whether any of the prospective jurors would hold against [the defendants] the fact that they exercised their Fifth Amendment privilege not to testify was . . . an error that is not subject to harmless error analysis.").
Courts in other jurisdictions have held that there is no right to question jurors on this topic. *See, e.g.*, *Jacobs v. Redman*, 616 F.2d 1251, 1255-56 (3rd Cir. 1980); *United States v. Rodriguez*, 993 F.2d 1170, 1176-77 (5th Cir. 1993); *United States v. Aloi*, 9 F.3d 438, 441 (6th Cir. 1993); *State v. Bitz*, 460 P.2d 374, 378-79 (Idaho 1969); *People v. Lambo*, 154 N.W.2d 583, 584-85 (Mich. Ct. App. 1967); *State v. Espinosa*, 756 P.2d 573, 576 (N.M. 1988); *Commonwealth v. Kingsley*, 391 A.2d 1027, 1033 (Pa. 1978).

issue at trial, thereby preventing unnecessary appeals and retrials.'" *Hammer*, 74 Va. App. at

236 (quoting *Creamer v. Commonwealth*, 64 Va. App. 185, 195 (2015)).  This rule applies "to

bar even constitutional claims." *Ohree v. Commonwealth*, 26 Va. App. 299, 308 (1998).[5]

As for his statutory argument under Code § 19.2-262.01, we find no "manifest error,"

*Juniper*, 271 Va. at 401, in the trial court's exercise of discretion to deny him permission to ask

questions 6-9.  The General Assembly did not list questions about the defendant's right not to

testify among the areas of voir dire mentioned in the statute.  *Cf.* Mass. Gen. Laws ch. 234A

§ 67A (2016) ("In a criminal case such examination shall include questions designed to learn

whether such juror understands that . . . the defendant need not present evidence on the

defendant's behalf.").  Nor is that topic among the seven mandatory areas of questioning listed in

Rule 3A:14(a).

Gardner argues that questions 6-9 were relevant to determining whether any juror was

"sensible of any bias or prejudice," Code § 19.2-262.01, toward a defendant who did not testify.

But even assuming that premise to be correct, the trial court could reasonably find that the issue

was adequately covered by the question Gardner was permitted to ask: "[D]oes everyone here

understand and agree that Mr. Gardner is presumed innocent unless and until the Commonwealth

proves him guilty beyond a reasonable doubt?"  No member of the venire voiced any

disagreement.  As explained above, "the trial judge retains discretion as to the form and number

of questions on the subject." *Reynolds*, 6 Va. App. at 169 (quoting *Turner*, 476 U.S. at 37).  The

trial court here could have properly concluded that the jury pool understood that the

Commonwealth alone bore the burden of proof, that no one labored under the misunderstanding

---

[5] Gardner "does not invoke the good cause or ends of justice exceptions to Rule 5A:18, and the Court will not apply the exceptions *sua sponte*." *Hogle v. Commonwealth*, 75 Va. App. 743, 756 (2022).

that Gardner would have to testify to exonerate himself, and that further questioning on this topic would be cumulative.[6]

Gardner relies on *Griffin v. Commonwealth*, 19 Va. App. 619 (1995), but *Griffin* is distinguishable. After the venireperson there revealed his actual misunderstanding that a criminal defendant must "prove his innocence" to be acquitted, the juror gave only an "equivocal response" to the judge's effort to rehabilitate him. *Id*. at 622, 625. Because there was "[s]ufficient doubt" that the venireperson "could lay aside his firm misconception as to the law and as to his ability to follow the court's instructions to the jury," the trial court abused its discretion in failing to remove the juror for cause. *Id*. at 626. By contrast, there was nothing here to suggest that any venireperson misunderstood Gardner's right not to testify. Gardner acknowledged at oral argument that he could point to no facts below to suggest that a venireperson might have misunderstood the defendant's right not to testify or might not have followed the trial court's instructions about that right.

In short, Gardner has failed to show that the trial court abused its discretion in denying him permission to ask questions 6-9. Nor has he shown "that the jury panel lacked impartiality or that the jury selection process the court employed was prejudicial." *Skipper*, 23 Va. App. at 428.

### 2. *Questions about firearms*

Gardner complains that the trial court should have permitted him to ask these four questions about the venirepersons' experience with gun violence:

---

[6] The trial court also instructed the jury that Gardner "is presumed to be innocent"; that "presumption of innocence remains . . . throughout the trial"; "[t]here is no burden on the defendant to produce any evidence"; Gardner "*does not have to testify*"; and—most importantly here—Gardner's "exercise of that right [not to testify] *cannot be considered by you*." (Emphases added.) The jury is presumed to have followed the trial court's instructions. *See Bethea v. Commonwealth*, 68 Va. App. 487, 508 (2018).

- 12 -

11. Have any of you been shot by a gun or have been shot at by someone with a gun?

12. Have you seen anyone else get shot at or actually get shot by a gun?

13. Have any of you had family that died from getting shot by a gun?

14. Has anyone here ever had a gun pulled on them?

Gardner acknowledges on brief that it was "clear" that his trial counsel understood there "was no allegation that [he] used a firearm." He says that at the beginning of the trial, his counsel thought that one witness might testify that Alvin had a gun during the incident. But as it turned out, no witness at trial said anything about any gun. Still, in Gardner's view, the trial court erred by barring these questions that would have revealed whether any of the prospective jurors had "strong feelings" about firearms.

This claim lacks merit. Given that no witness testified at trial that any firearm was involved, it was not an abuse of discretion to bar Gardner from asking firearms-related questions. Allowing questions about gun violence "would [have] require[d] . . . juror[s] to speculate on what evidence would be presented," *Poyner v. Commonwealth*, 229 Va. 401, 414-15 (1985), when in fact no gun-related evidence was put forward. Because answers to those questions would not "necessarily disclose, or clearly lead to the disclosure of the statutory factors of relationship, interest, opinion, or prejudice," *LeVasseur*, 225 Va. at 581, the questions were not relevant, *id.*, and the trial court did not abuse its discretion in denying permission to ask them. The jurors' experiences "might well [have been] interesting to counsel, but they ha[d] no relationship to the juror's ability to abide by the court's instructions, to find the facts impartially, [or] to apply the law to the facts conscientiously." *Juniper*, 271 Va. at 397 (quoting *LeVasseur*, 225 Va. at 582).

- 13 -

*3.  Questions about race*

The trial court also declined Gardner's request to ask the venire a battery of questions relating to potential racial bias:

> 15.  In general, do you think our society treats people of all races equally?
>
> 16.  Have you been exposed to persons who exhibit, or who have exhibited, racial prejudice?
>
> 17.  Do any of you believe there are innate differences between white men and black men?
>
>> a.  For example, some people believe that black men are more impulsive or undisciplined than white men.
>>
>> b.  Do any of you agree that black men tend to be more impulsive or undisciplined?
>
> 18.  Do any of you believe that we can hold prejudices that we don't recognize—often called implicit bias?
>
>> a.  Do any of you believe that "there is not a racist bone in your body?"
>>
>> b.  Does anyone disagree with the idea that our unconscious prejudices can influence how we evaluate other people?

Gardner concedes on brief that some of those questions "would clearly not have led to the disclosure of bias or prejudice."  But he maintains that "question 17(b) was relevant as it related to the juror's possible bias or prejudice in deciding an issue particular to this case."  He reasons, "If a juror agreed that black men are more impulsive and undisciplined than other men, such racial bias may prevent that juror from deciding with fairness and impartiality whether the Defendant's reaction was reasonable."  So he claims that the trial court's refusal to allow that question violated his statutory voir dire rights and his "right to due process."

Unlike with the other voir dire questions addressed above, Gardner preserved his due-process argument as to these questions.  Still, he has never cited any case law in support of his argument, either in the trial court or here.  Insisting that the argument is therefore defaulted,

the Commonwealth likewise cited no authority on the constitutional question. We note that a number of federal and Virginia cases have addressed whether and when a defendant in a criminal case may have a constitutional right to ask about the potential racial bias of venirepersons.[7]

But "it is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments . . . , and where a party fails to develop an argument in support of [a] contention or merely constructs a skeletal argument, the issue is waived." *Coward v. Wellmont Health Sys.*, 295 Va. 351, 367 (2018) (quoting *Bartley v. Commonwealth*, 67 Va. App. 740, 746 (2017)). "To ignore such a rule by addressing the case on the merits would require this court to be an advocate for, as well as the judge of the correctness of, [appellant's] position on the issues he raises." *Bartley*, 67 Va. App. at 744 (alteration in original) (quoting *Jones v. Commonwealth*, 51 Va. App. 730, 734-35 (2008), *aff'd in part, vacated in part*, 279 Va. 52 (2010)). Finding the briefing deficiency here to be considerable, *Moncrieffe*, 76 Va. App. at 503, we agree with the Commonwealth that Gardner has defaulted his due-process argument.

As for Gardner's statutory claim, we find no abuse of discretion under Code § 19.2-262.01 when the trial court disallowed question 17(b). The court told the venire that "one

---

[7] *See, e.g.*, *Rosales-Lopez v. United States*, 451 U.S. 182, 192 (1981) ("[F]ederal trial courts must make such an inquiry [about racial prejudice] when requested by a defendant accused of a violent crime and where the defendant and the victim are members of different racial or ethnic groups."); *Turner*, 221 Va. at 523 ("While 'the wiser course generally is to propound appropriate questions designed to identify racial prejudice if requested by the defendant,' a trial court's refusal to do so is not constitutionally objectionable in the absence of factors similar to those in *Ham* [*v. South Carolina*, 409 U.S. 524 (1973)].' The mere fact that a defendant is black and that a victim is white does not constitutionally mandate such an inquiry." (quoting *Ristaino v. Ross*, 424 U.S. 589, 597 n.9 (1976))); *Lewis v. Commonwealth*, 218 Va. 31, 36 (1977) ("Here, it appears that the deceased victim . . . was white and that the defendant is black. But beyond the fact of the defendant's race, nothing appears from the record to suggest there was any likelihood racial prejudice might affect the defendant's trial. *Ristaino* applies, therefore, and we hold there was no denial of due process in the trial court's refusal of the defendant's voir dire request."); *Reynolds*, 6 Va. App. at 165 ("[W]e must decide whether there were 'special circumstances' present in the case before us, such that [the defendant] was constitutionally entitled to ask prospective jurors questions specifically directed to racial prejudice.").

or more of the parties to the case and witnesses in the case may appear to come from a particular nationality, racial or religious group." The court then asked, "Would that fact alone affect your judgment on the issues or your approach to the weight and credibility that you would give to his or her testimony?" No venireperson suggested any difficulty. When Gardner proffered his questions about race, the prosecutor objected, noting that the court had already "ask[ed] whether or not matters of race . . . would influence the juror's evaluation of testimony . . . . I think that covered this matter." The court then disallowed the question.

The trial court acted within its discretion in allowing its questions to suffice on the issue of racial bias given the absence of venire response. Even when the subject is relevant under Code § 19.2-262.01, "the trial judge retains discretion as to the form and number of questions on the subject." *Reynolds*, 6 Va. App. at 169 (quoting *Turner*, 476 U.S. at 37). And "the decision of the trial judge who had the opportunity to 'weigh the meaning of the [venirepersons'] answers given in light of the phrasing of the questions posed, the inflections, tone, and tenor of the dialogue, and the general demeanor of the prospective juror' is entitled to much deference." *Mullis v. Commonwealth*, 3 Va. App. 564, 570 (1987) (quoting *Smith v. Commonwealth*, 219 Va. 455, 464-65 (1978)). Given that deferential standard, we find no "manifest error," *Hopson*, 52 Va. App. at 152, in the court's declining to permit Gardner's questions.

*B. Sufficiency of the Evidence*

Gardner's remaining assignments of error claim that the Commonwealth failed to prove three of the elements required to convict him of aggravated malicious wounding. Code § 18.2-51.2(A) defines that offense as follows:

> If any person maliciously shoots, stabs, cuts or wounds any other person, or by any means causes bodily injury, with the intent to maim, disfigure, disable or kill, he shall be guilty of a Class 2 felony if the victim is thereby severely injured and is caused to suffer permanent and significant physical impairment.

- 16 -

Gardner claims that Alvin did not suffer "permanent and significant physical impairment" (Assignment of Error 2). Gardner adds that the Commonwealth failed to prove that he acted with malice (Assignment of Error 3) and with "an intent to maim, disfigure, disable, or kill (Assignment of Error 4).

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The relevant issue on appeal is, 'upon review of the evidence in the light most favorable to the prosecution, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Lambert v. Commonwealth*, 298 Va. 510, 515 (2020) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)).

*1. Permanent and Significant Physical Impairment (Assignment of Error 2)*

"'"[P]hysical impairment" for purposes of this criminal statute' is defined as '"any physical condition, anatomic loss, or cosmetic disfigurement."'" *Alston v. Commonwealth*, 77 Va. App. 639, 650 (2023) (quoting *Lamm v. Commonwealth*, 55 Va. App. 637, 644 (2010)). "To prove an injury is permanent, the Commonwealth need not present definitive testimony that a victim's injuries will never improve, but instead can leave it to the common sense of the jury to determine if the injuries are permanent." *Lamm*, 55 Va. App. at 644-45 (citing *Martinez v. Commonwealth*, 42 Va. App. 9, 23-25 (2003)).

There was ample evidence here to support the jury's conclusion that Alvin's injuries were both permanent and significant. Alvin suffered at least four "different facial bone fractures in separate locations on both sides of the face." The maxilla bones on each side of his face were shattered. Alvin needed reconstructive surgery to repair his injuries, requiring the insertion of

titanium plates and screws to support his eye. His plastic surgeon, whom the trial court qualified as an expert in reconstructive surgery and the long-term facial prognosis of facial fractures, testified that he would not remove the plates or screws because of the surgical risks. Those facts alone establish permanency. *See Lamm*, 55 Va. App. at 645 (finding permanency of injury supported by evidence that surgical plates "remained in [the victim's] face at the time of trial and the surgeon said he did not intend to remove them").

The surgeon also said that Alvin could experience lifelong problems from his injuries, including long-term cold sensitivity, chronic pain, pain at the site of the injury during cold weather, and pain when chewing hard items. *See id.* (upholding permanent-injury finding based on the continuing numbness in the victim's teeth). At trial, Alvin's eye was misshapen, showing that he "unquestionably suffered cosmetic disfigurement caused by bodily injury." *Newton v. Commonwealth*, 21 Va. App. 86, 90 (1995). And his face still showed scars from the attack. *Accord Ellis v. Commonwealth*, 70 Va. App. 385, 392 (2019) ("[W]e have found 'permanent and significant' impairments to include visible scars and scars connected to nerve damage.").

Alvin also testified that he cannot eat a steak anymore, his favorite food. In fact, he cannot eat any meat that has not been liquified in a blender. He must sleep sitting upright with a neck pillow. He cannot interact easily with his children. He experiences significant pain in his sinuses when he sneezes or blows his nose. His eyes dry out when it is hot outside. And when it is cold, he feels as if "pins and needles are going through [his] face."

The jury thus had more than enough evidence to conclude that Alvin suffered a permanent and significant physical impairment from being beaten by Gardner.

*2. Malice (Assignment of Error 3)*

"Malice inheres in the 'doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will.'" *Alston*, 77 Va. App. at 648 (quoting *Tizon v. Commonwealth*,

60 Va. App. 1, 11 (2012)). Malice "exists when a person commits 'any purposeful and cruel act without any or without great provocation.'" *Id.* (quoting *Fletcher v. Commonwealth*, 72 Va. App. 493, 507 (2020)). "Malice 'may be directly evidenced by words[ ] or inferred from acts and conduct which necessarily result in injury.'" *Id.* (alteration in original) (quoting *Ramos v. Commonwealth*, 71 Va. App. 150, 162 (2019)). "Whether or not an accused acted with malice is generally a question of fact and may be proved by circumstantial evidence." *Canipe v. Commonwealth*, 25 Va. App. 629, 642 (1997).

Gardner claims that he acted out of heat of passion when he beat up Alvin, not malice. "'[O]ver the last two centuries, "heat of passion upon reasonable provocation" has evolved into the only currently legally recognized factor in the Commonwealth that negates malice.'" *Dandridge v. Commonwealth*, 72 Va. App. 669, 681 (2021) (alteration in original) (quoting *Smith v. Commonwealth*, 68 Va. App. 399, 426 (Humphreys, J., concurring), *aff'd*, 296 Va. 450 (2018)). Heat of passion "refers to the *furor brevis* which renders a [person] deaf to the voice of reason." *Washington v. Commonwealth*, 75 Va. App. 606, 619 (2022) (alteration in original) (quoting *Rhodes v. Commonwealth*, 41 Va. App. 195, 200 (2003)). "Whether violence was completed in the heat of passion and due to a reasonable provocation is generally a question for the fact finder." *Id.*

The jury here was instructed on the elements of both malice and heat of passion. By its verdict, the jury rejected Gardner's heat-of-passion claim. There was ample record evidence to support its doing so.

To start, our case law makes clear that "an assault with a bare fist may be attended with such circumstances of violence and brutality that [malice] may be presumed." *Ramos*, 71 Va. App. at 162 (alteration in original) (quoting *Fletcher v. Commonwealth*, 209 Va. 636, 640 (1969)). Gardner's attack on Alvin was just such a brutal attack. Gardner had "way more

muscle and mass than" Alvin. After dragging Alvin outside and throwing him to the ground, Gardner sat like a "boulder" on top of him, using his knees to pin Alvin's arms to the ground so Gardner could punch him in the face unimpeded. Using his fists, Gardner proceeded to pummel Alvin for about five minutes, "just straight punching on the face."

The jury could also reasonably reject Gardner's heat-of-passion claim by finding that Gardner failed to "prove that he acted after a reasonable provocation." *Alston*, 77 Va. App. at 649. Alvin denied having threatened Gardner at any point before the assault. The event that precipitated Gardner's violent attack was Alvin's placing two bags of Gardner's belongings outside the door of Alvin's house. But Alvin did that only after Gardner refused to leave after being asked repeatedly to go. The jury could properly conclude that Gardner's violent reaction was an unreasonable and unprovoked response to a perfectly reasonable request to leave someone else's home.

### 3. *Intent to Maim, Disfigure, Disable, or Kill (Assignment of Error 4)*

A similar analysis disposes of Gardner's claim that the Commonwealth failed to prove his intent to maim, disfigure, disable, or kill. "Intent can, and often must, be inferred from the act itself." *Perkins*, 295 Va. at 331. "Thus, '[i]t is proper for a court to consider not only the method by which a victim is wounded, but also the circumstances under which that injury was inflicted in determining whether there is sufficient evidence to prove an intent to maim, disfigure, disable or kill." *Id.* at 330 (alteration in original) (quoting *Burkeen v. Commonwealth*, 286 Va. 255, 260-61 (2013)). "[T]he intent to permanently injure may be presumed from a *single* blow with a bare fist, where that single blow is combined with circumstances of violence and brutality." *Dominguez v. Pruett*, 287 Va. 434, 444 (2014) (emphasis altered). "As far back as *M'Whirt's Case*, 44 Va. (3 Gratt.) 594, 611 (1846), it was recognized that while 'fists may not, indeed, be regarded generally, as a deadly weapon . . . they become most deadly, by blows

- 20 -

often repeated, long continued, and applied to vital and delicate parts of the body of a defenceless, unresisting man, on the ground.'" *Johnson v. Commonwealth*, 53 Va. App. 79, 101 (2008) (alteration in original).

Here, Alvin was violently attacked by Gardner, with Alvin's face enduring five minutes of repeated fist blows, not just one. Gardner repeatedly hit Alvin in a "vital and delicate part[] of [his] body" while Alvin was defenseless, *id.*, resulting "in serious and disfiguring injur[ies]," *Dominguez*, 287 Va. at 444 (quoting *Burkeen*, 286 Va. at 261). Viewed in the light most favorable to the Commonwealth, the evidence sufficed to show that Gardner intended to permanently disable and disfigure Alvin, if not maim or kill him.

CONCLUSION

We find no reversible error in the trial court's refusal to allow Gardner to ask the challenged voir dire questions. And the evidence sufficed to prove the elements of aggravated malicious wounding.

*Affirmed.*